# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00040-CR

**Lawrence David Hernandez, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
## NO. CR2006-115, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Lawrence Hernandez was found guilty of indecency with a child by contact. *See* Tex. Penal Code Ann. § 21.11 (West 2003). On appeal, Hernandez argues that the district court was biased against him, that the district court erred by allowing the State to introduce inadmissible evidence, and that the district court improperly prevented him from cross-examining witnesses. We will affirm the judgment of the district court.

## BACKGROUND

Hernandez is the grandfather of the alleged victim in this case, N.C., and is the father of N.C.'s mother, Lillian Cruz. Lillian is married to N.C.'s father, Eric Cruz. At the time of the alleged offense, N.C. was eight years old.

On June 29, 2005, Eric and Lillian left their house to complete the purchase of a new home. Before leaving, they asked their niece, G.G., to watch over N.C. and their three other

children. Hernandez was also in the Cruzes' house at the time they left their home. After the Cruzes left, Hernandez began drinking.

At the time of the allegedly improper contact, Hernandez was sitting on a bar stool in the kitchen along a counter that divided the kitchen from the dining room, and N.C., one of her siblings, and G.G. were playing in the dining room. While sitting on the stool, Hernandez asked N.C. to walk over and give him a hug. What transpired after that request forms the basis for this case and will be discussed more thoroughly later. After the allegedly improper behavior occurred, N.C. went back to the dining room.

When the Cruzes returned home, Lillian noticed that Hernandez was drunk and told him to go to one of the bedrooms to sleep. Before he went to bed, Hernandez asked N.C. and the other children to give him a kiss goodnight. After Hernandez went to bed, N.C. told Lillian that something inappropriate had occurred between her and Hernandez while the Cruzes were gone. Lillian then woke Hernandez up and told him to leave the house. Once Hernandez left the house, Lillian called the police.

Officer Randall Bryan responded to the call. When Officer Bryan arrived at the Cruzes' home, Lillian told him what N.C. had said. After talking with Lillian, Officer Bryan left the Cruzes' home to look for Hernandez. Several hours later, Officer Bryan found Hernandez in the parking lot of a fast food restaurant. After observing Hernandez, Officer Bryan believed that Hernandez was intoxicated and was a danger to himself and others; accordingly, Officer Bryan arrested Hernandez for public intoxication. *See id.* § 49.02 (West Supp. 2009).

A few days after Hernandez was arrested, N.C. was interviewed at the Seguin Children's Advocacy Center (the "Center") by one of its employees, Kristi Williams. Eventually, Hernandez was charged with indecency with a child by sexual contact. *See id.* § 21.11 (explaining that person commits offense if person engages in sexual contact with child, which includes touching any part of child with person's genitals, even through clothing, provided that touching was made with intent to arouse or gratify sexual desire). Hernandez pleaded not guilty to the charges.

A trial ensued, various witnesses testified, and the State introduced evidence of Hernandez's prior convictions for attempted indecency with a child. *See id.*; *see also id.* § 15.01 (West 2003) (explaining criminal attempt). After the trial ended, the jury found Hernandez guilty. During sentencing, Hernandez pleaded true to two enhancements arising from his prior convictions. The jury sentenced Hernandez to twenty-five years' imprisonment.

Hernandez appeals the judgement of the district court.

**Evidence Presented at Trial**

Because the evidence presented at trial is relevant to the issues raised on appeal, we will summarize it here. During the trial, Lillian and Officer Bryan provided testimony regarding the night of the arrest. In addition, evidence was also introduced regarding conversations Lillian and Eric had with N.C. and their other children after the incident and regarding Lillian's and Eric's beliefs about whether criminal contact had occurred. Further, the State introduced a video of the interview N.C. gave at the Center, and N.C. testified regarding the allegedly improper interaction with Hernandez and about her interview. Finally, the State introduced evidence regarding Hernandez's prior convictions.

*Night of the Arrest*

During the trial, Lillian testified that Hernandez had not consumed any alcohol prior to her leaving the house on the night of the incident but that Hernandez was intoxicated when she came back home. In addition, Lillian stated that when she came home, N.C.'s demeanor was slightly different and that N.C. was "very clingy."

Lillian also testified that shortly after she returned home on the night in question, N.C. told her that something inappropriate happened while she was gone. In particular, Lillian stated that N.C. told her that while she and Eric were gone, Hernandez asked N.C. to give him a hug; that Hernandez was sitting on a stool when he made the request; that Hernandez and N.C. held hands; that Hernandez placed the hands "down here"; that while they were holding hands, the hands "went this way . . . together"; and that while they were holding hands, the hands were placed in the "private area." Later, Lillian agreed that N.C. had said that Hernandez had moved her hand towards the "private area" and that N.C. said she became uncomfortable when her hand stopped. Lillian also stated that after her daughter told her that an uncomfortable exchange occurred, she did not ask for more details prior to calling the police. Further, Lillian testified that after the police arrived, she told the responding officer, Officer Bryan, that she did not want to press charges against Hernandez at that time.

In his testimony, Officer Bryan confirmed that when he arrived on the scene, Lillian stated that she did not want to press charges against Hernandez, but he also stated that Lillian told him that she did not want Hernandez to return to the house. In addition, Officer Bryan stated that Lillian informed him that after she arrived home, she noticed that N.C. was "very clingy, acting

4

unusual, and that she was clinging to herself. Everywhere she went, her daughter was following her, which was out of character for [N.C.]" Moreover, Officer Bryan revealed that Lillian informed him that her daughter "cried out that she had been improperly contacted by her grandfather . . . [s]exually."[1]

*After the Arrest*

During the trial, a letter that had been written by Lillian after Hernandez was arrested was admitted into evidence. Before trial, Lillian prepared the letter and instructed Hernandez's attorney to forward it to the district attorney's office. In the letter, Lillian wrote that prior to calling the police, she "did not allow [herself] time to ask questions and make sense of anything, and in a split second [she] called the police to escort [her] father out of [her] home." Further, she wrote that she did not press charges when the police arrived because she "wasn't exactly clear of details" and that she has come to believe that she "jumped to conclusions and prematurely called the police that night."

The letter communicated Lillian's belief that her father, in an inebriated state, clumsily dropped his arms on top of N.C.'s, which caused N.C.'s hand to land "too high on his lap." Further, Lillian wrote that she asked her daughter specifically what happened and that N.C. stated that Hernandez did not force her hand to his private area, that her hand was on his lap for only a second or two, that no rubbing occurred, and that nothing else inappropriate occurred. Additionally, although the letter stated that Hernandez did kiss N.C. before he went to bed, the letter also stated

---

[1] Officer Bryan admitted that he did not question any of the individuals, including N.C., who had been in the house at the time of the allegedly improper contact.

5

that he kissed all of Lillian's children before he went to bed. Morever, Lillian wrote that neither she nor her husband saw anything inappropriate happen when Hernandez kissed the children.

In her testimony, Lillian repeated many of the assertions made in her letter and also provided some additional information. In particular, Lillian testified that it was not unusual for N.C. or any of her children to be on Hernandez's lap because her children love Hernandez and climb all over him. In addition, Lillian said that after Hernandez had been arrested, she discussed the matter more thoroughly with N.C., and N.C. informed her that the touching at issue only lasted one or two seconds. Moreover, Lillian explained that N.C. stated that during the touching she did not feel Hernandez's penis or "anything at all." Furthermore, Lillian denied that N.C. ever said that Hernandez patted N.C.'s hand. In addition, Lillian stated that N.C. never said that Hernandez forced her to keep her hand anywhere, never communicated that Hernandez was attempting to obtain sexual gratification through the touching, and never said that she was afraid Hernandez was going to force her to engage in sexual conduct. In fact, Lillian testified that after Hernandez had been arrested, N.C. said that she did not think Hernandez had done anything wrong. Further, Lillian stated that she talked with her other children and that none of them noticed anything improper that evening or stated that N.C. started behaving differently after her interaction with Hernandez. Finally, Lillian testified that after more thoroughly investigating the matter, she came to the conclusion that Hernandez did not intend for anything improper to occur and that any improper touching was inadvertent and brief.[2]

---

[2] In her testimony, Lillian also stated that although Hernandez was her father, she would not give testimony in favor of Hernandez if she believed that he had improperly touched N.C. In fact, Lillian stated that N.C. is her priority, that she stands behind N.C., and that she would not lie to protect her father if he had done anything to hurt N.C. Moreover, Lillian testified that she has always encouraged N.C. to tell the truth in this matter and has not pressured her daughter to change her story.

6

Eric provided similar testimony during the trial. In particular, he stated that he asked his daughter what had happened that evening and that she said Hernandez "just kind of placed" her hand "close to the groin area." Moreover, he stated that N.C. never said the word "penis" when she described the incident. Additionally, he expressed his belief that Lillian should not have involved the police without discussing the matter more thoroughly because "I think it might have been a misunderstanding." Finally, he stated that after talking with N.C. on the evening of the incident, he came to the conclusion that the touching was accidental and not sexual in nature.[3]

*N.C.'s Interview and Testimony*

During the trial, the State played a videotape of N.C.'s interview at the Center. In the interview, N.C. was asked to look at drawings of a male and a female and to identify various parts of the body. Among other body parts, N.C. was asked to state what words she used to refer to the male and female genital regions, and N.C. stated that she called them "private parts."

Regarding the incident with Hernandez, N.C. stated that when she hugged her grandfather, she put her hand on her grandfather's side and that Hernandez moved it down. When Williams asked where Hernandez moved her hand to, she pointed to the area on the male drawing that she had referred to as the "private parts." Later, N.C. stated that Hernandez grabbed her hand, moved it down to the "private parts," and then patted her hand. In addition, N.C. stated that Hernandez did not say anything to her when he moved her hand. In response to a question by

---

[3] Like Lillian, Eric insisted that he had not pressured N.C. to change her story. In addition, although Eric testified that he believed that the touching that occurred was not improper, he also stated that he would be asking for Hernandez to be punished if he actually believed that Hernandez had done anything wrong.

7

Williams, N.C. said that she felt Hernandez's private parts; however, N.C. also stated that she did not feel anything and that she did not feel anything hard or soft. Furthermore, N.C. communicated that although Hernandez was holding her tight, she was able to get away when she tried and that Hernandez only held her hand for one or two seconds.

In the interview, N.C. also stated that her grandfather was very drunk on that evening and indicated that he was unstable on his feet. Moreover, she said that seeing her grandfather in that condition upset her because she had never seen him like that before. Finally, N.C. stated that after her parents came home, Hernandez kissed her on the mouth and that his mouth was open.

During the trial, N.C. testified regarding the incident and regarding her interview at the Center. Regarding the incident, N.C. stated that while he was sitting on the bar stool, Hernandez asked her to give him a hug. N.C. commented that Hernandez was drunk when he made the request and that his condition made her uncomfortable. In addition, N.C. stated that Hernandez stayed seated when she came to give him a hug and that she hugged him from the side. Further, she testified that when she was hugging Hernandez, her hand landed on the side of his stomach or somewhere near his private parts and that Hernandez moved her hand to "somewhere by his private parts" or "[o]n his private parts" or "private area." She also stated that her hand only stayed there for a second or two. Further, N.C. explained that Hernandez did not pat her hand while it was on or near his private parts and that no rubbing or anything inappropriate happened. Moreover, she testified that she did not feel Hernandez's private parts; instead, she stated that she only felt Hernandez's leg. N.C. then testified that although she felt uncomfortable, she believed that the inappropriate touching was accidental in nature. Furthermore, N.C. explained that after she started

feeling uncomfortable, she went back to the dining room and that Hernandez did not try to keep her from leaving the kitchen.

In addition, N.C. testified that after her parents came home and when Hernandez was going to bed, Hernandez gave her a hug and kissed her on the mouth. Although she testified that she did not like the hug and kiss, she also stated that Hernandez hugged and kissed her siblings as well.

Regarding the video of her interview at the Center, N.C. stated that she was confused when she answered some of the questions asked by Williams. Moreover, she testified that she had not been truthful when she said that she had felt Hernandez's private parts.

*Prior Convictions*

As mentioned earlier, during the guilt/innocence phase of the trial, the State introduced evidence regarding some of Hernandez's prior criminal acts. First, the State called J.V., one of the victims from the prior crimes, and Nancy Varchus, J.V.'s mother, to testify regarding Hernandez's prior convictions for attempted indecency with a child.

The State then called Randy Graef, a probation officer, to testify regarding those prior convictions. During Graef's testimony, the pre-sentence investigation report that had been prepared when Hernandez pleaded guilty to the attempted indecency charges was admitted into evidence.

**DISCUSSION**

Hernandez raises four related issues on appeal. First, Hernandez contends that the district court was biased against him and, thereby, denied him his constitutional right to a fair trial. Second, Hernandez asserts that the district court erred by failing to give a requested limiting

instruction to the jury, by allowing in hearsay evidence, by allowing in evidence that improperly bolstered the State's case, and by allowing the State to call witnesses for the purpose of impeaching the witnesses with otherwise inadmissible evidence. Third, Hernandez argues that the district court erred by allowing in evidence of Hernandez's prior convictions, including the pre-sentence investigation report prepared when he pleaded guilty to the prior convictions. Finally, Hernandez contends that the district court erred by denying him the right to properly cross-examine witnesses. Because Hernandez incorporates arguments made in his subsequent issues into his prior issues, we will address his arguments in reverse order.

**Fourth Issue**

In his fourth issue, Hernandez argues that the district court erred by prohibiting him from fully cross-examining N.C. Appellate courts review trial court's limitations on cross-examination for an abuse of discretion. *See Billodeau v. State*, 277 S.W.3d 34, 43 (Tex. Crim. App. 2009). Accordingly, appellate courts do not reverse a court's decision provided that the ruling "was within the zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). In other words, if reasonable individuals can disagree about the decision, an appellate court should not reverse the trial court's determination. *See id.*

In making his argument on appeal, Hernandez refers to an exchange that occurred after N.C. was asked to watch a portion of her interview at the Center in order to refresh her memory. *See* Tex. R. Evid. 803(5) (allowing use of prior statement to refresh memory of witness who no longer has sufficient recollection of event to testify fully). After N.C. finished watching the video, Hernandez, outside the presence of the jury, asked the district court for permission to "voir dire her

10

and question her a little bit on this issue." After the district court granted permission, Hernandez inquired whether various statements N.C. made in the video were true or whether she made the statements because she was nervous. In answering his questions, N.C. stated that she did not feel Hernandez's penis and stated that no one had told her to change her story. Then, Hernandez asked N.C. whether in response to a question by Williams, she had told Williams that Hernandez prevented her from leaving the living room. When N.C. answered in the negative, Hernandez stated, "Even though [Williams] says it, it's not true." At this point, the State objected to the statement as being outside the scope of determining whether the video refreshed N.C.'s memory, and the district court sustained the objection. After initially objecting to the district court's ruling on a different ground, Hernandez then argued that his ability to cross-examine the witnesses was being improperly restricted.

In light of this exchange, Hernandez argues on appeal that he was improperly denied the opportunity to cross-examine N.C. regarding whether she lied to Williams and whether Williams bullied N.C. into making false statements. *See London v. State*, 739 S.W.2d 842, 846 (Tex. Crim. App. 1987) (explaining that in general, party is entitled "to show any relevant fact which would or might tend to establish ill feeling, bias, motive, interest or animus on the part of any witness testifying against him"). In other words, Hernandez contends that the district court prohibited him from delving into N.C.'s potential motivations for not telling the truth. Further, Hernandez insists that the district court's decision deprived him of his "right to present a defense" in violation of the federal and Texas constitutions. *See* U.S. Const. amend. VI; Tex. Const. art. I, § 9.

When making its ruling, the district court did not prohibit Hernandez from questioning N.C. regarding whether she had been pressured to lie during the interview. Rather, the

11

court ruled that any more questions regarding the interview were "going to be in front of the jury." Moreover, when Hernandez stated that he felt his ability to cross-examine was being improperly restricted, the court informed Hernandez that he was free to continue questioning N.C. but that the questioning would be done in front of the jury. After the court made its ruling, Hernandez continued to question N.C.[4] and repeatedly asked her whether she had been truthful during her interview at the Center.[5]

In light of the preceding, we cannot conclude that the district court abused its discretion by improperly restricting Hernandez's right to cross-examine witnesses. Although the district court did prohibit Hernandez from asking N.C. certain questions outside the presence of the jury during a hearing called for a limited purpose, the district court imposed no such restrictions regarding his ability to cross-examine the witnesses in front of the jury. *See Billodeau*, 277 S.W.3d at 43 (stating that trial court may impose reasonable restrictions on cross-examination). Accordingly, we overrule Hernandez's fourth issue on appeal.

**Third Issue**

In his third issue, Hernandez contends that the district court erred by allowing in evidence of his prior convictions, by admitting the pre-sentence investigation report prepared when he pleaded guilty to the prior crimes, and by admitting the videotape of N.C.'s interview at the

---

[4] During the questioning, the video that had originally been played to refresh N.C.'s memory was played for the jury.

[5] In response to Hernandez's comment about his right to cross-examine witnesses, the court also stated that Hernandez was free to question Williams as well. It is worth noting that when Williams was called to the stand, Hernandez did not ask her whether she had improperly pressured N.C. to give false answers.

12

Center.  Hernandez argues that all of these decisions by the district court were contrary to the rules of evidence.

*Prior Convictions*

As discussed earlier, the district court allowed the State to introduce evidence establishing that Hernandez had previously been convicted of two counts of attempted indecency with a child.  In particular, the State called J.V., one of the victims from the prior crimes, and Nancy Varchus, J.V.'s mother, to testify regarding the prior criminal misconduct.  J.V. testified that in 1994, when she was eight years old (the same age as N.C. at the time of the alleged offense at issue), she noticed a man in a Santa Claus costume sitting on a park bench near a playground.  Further, J.V. stated that after she went over to talk to the man, the man placed a hand on her breast and on her genitals.

In her testimony, Nancy stated that she saw a man dressed in a Santa outfit sit down on a park bench and call J.V. and another girl over to him.  Further, Nancy testified that after the girls went over to talk to him, she saw the man place his hands inside both J.V.'s and the other girl's pants.  In addition, Nancy stated that after she saw what the man had done, she started screaming and ran after him.  Moreover, Nancy communicated that when she caught up with the man, she noticed that he smelled like alcohol.  Finally, Nancy stated that she called the police and that Hernandez eventually pleaded guilty to two counts of attempted indecency with a child by contact.

During the trial, Hernandez objected to the admission of the evidence on the grounds that the prior convictions were being improperly admitted for the purpose of proving Hernandez's character and that the prior convictions were highly prejudicial.  *See* Tex. R. Evid. 403, 404(b).  On

13

appeal, Hernandez again urges that the evidence of his prior convictions was inadmissible under the rules of evidence.[6]

*Rule 404*

In general, "[e]vidence of other crimes . . . is not admissible to prove the character of a person in order to show action in conformity therewith." *Id.* R. 404(b). However, evidence of other crimes may be admitted if the evidence "has relevance *apart* from" this impermissible purpose. *Montgomery*, 810 S.W.2d at 387; *see also* Tex. R. Evid. 402 (explaining that irrelevant evidence is not admissible). In fact, rule of evidence 404 lists several instances in which extraneous-offense evidence may be admitted, including proving intent or the "absence of mistake or accident." Tex. R. Evid. 404(b); *see also Johnson v. State*, 932 S.W.2d 296, 302 (Tex. App.—Austin 1996, pet. ref'd) (explaining that if defendant asserts lack of intent or accident or mistake, State may offer evidence of other crimes or acts to show intent). This type of evidence has relevance "*beyond* its tendency 'to prove the character of a person to show that he acted in conformity therewith.'" *Montgomery*, 810 S.W.2d at 387 (quoting Tex. R. Evid. 404(b)). Accordingly, the evidence is admissible provided that its probative value is not substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403.

When reviewing a trial court's decision to admit extraneous-offense evidence under rule 404, an appellate court uses an abuse-of-discretion standard. *See Sells v. State*, 121 S.W.3d 748,

---

[6] During the trial, the district court stated as follows:

I think 404(b) is right on point. It makes it admissible. . . . I think absence of mistake or accident is the issue here. [A]nd the . . . balancing test weighs in favor of the State.

766 (Tex. Crim. App. 2003). Under that standard, an appellate court should reverse the decision only if it concludes that "by no reasonable perception of common experience can it be concluded that proffered evidence has a tendency to make the existence of a fact of consequence" other than character conformity "more or less probable than it would otherwise be." *See Montgomery*, 810 S.W.2d at 391; *see also* Tex. R. Evid. 401 (defining "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence").

During the trial, Hernandez argued that he did not have the requisite intent for the crime alleged and that the touching that occurred was accidental in nature.[7] Further, Hernandez asserted that N.C. misinterpreted his actions on the night in question and overreacted. Accordingly, Hernandez has attacked the credibility of N.C.'s outcry and asserted that he did not have the requisite intent. *See Montgomery*, 810 S.W.2d at 394 (explaining that because child sexual abuse crimes "usually occur in secrecy," cases often turn upon credibility of victim). In these circumstances, the district court could have reasonably concluded that evidence that Hernandez had previously sexually abused girls who were approximately the same age as N.C. was relevant to Hernandez's intent regarding his interaction with N.C. *Cf. id.* (explaining that evidence of prior acts of inappropriate sexual conduct with children "may well serve to shore up testimony of the child if in logic it shows a lascivious attitude (relevant to culpable intent)"); *see Rankin v. State*, 974 S.W.2d 707, 719

---

[7] We note that on appeal, Hernandez contends that he did not argue that the touching was accidental and instead admitted that the touching occurred but contended that he did not have the intent to "sexually gratify" himself when he touched N.C. Although the record shows that Hernandez did argue that the intent element was not met, the record also demonstrates that Hernandez put forth the defensive theory of accident or mistake. For instance, when questioning N.C., Hernandez asked her if she thought Hernandez's actions were accidental in nature.

15

(Tex. Crim. App. 1998) (on reh'g) (stating that extraneous-offense evidence will generally be relevant). The district court could also have determined that the evidence bears upon whether the allegedly inappropriate contact was the result of an accident or a mistake.

In light of the preceding, we cannot conclude that the district court abused its discretion in admitting the evidence under rule 404(b). *See Montgomery*, 810 S.W.2d at 390 (explaining that trial courts have leeway in deciding whether extraneous-offense evidence serves purpose other than evidence of character); *see also Rankin*, 974 S.W.2d at 719 (noting that when intent is element and cannot be proven by act itself, "evidence of other acts probative of such intent is relevant and the trial court's decision to admit such evidence is proper").

*Rule 403*

Having determined that the district court did not err in admitting the evidence under rule 404(b), we must now address Hernandez's rule 403 objection. Even when evidence of prior criminal conduct is admissible under rule 404, the evidence may still be excluded under rule 403 if the evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. Rule 403's scope is narrow, and courts should only sparingly use it to justify exclusion. *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007). "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389; *see also De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (noting that rule 403 is rule of inclusion rather than exclusion and that it only excludes evidence offered solely for purpose of proving bad

character). In other words, in close cases, "trial courts should favor admission" of the evidence. *Montgomery*, 810 S.W.2d at 389. In the balance between the probative value of evidence and the danger that it will be unfairly prejudicial, "probativeness is the weightier consideration." *Id.* at 388; *see also Fields*, 483 F.3d at 354 (explaining that major function of rule 403 is to exclude evidence that has only scant or cumulative probative value). When determining whether evidence is "unfairly" prejudicial, courts must consider its tendency to induce a decision on an improper basis, including an emotional basis. *Montgomery*, 810 S.W.2d at 389. In sexual assault and abuse cases, rule 403 "should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant" because their credibility is often the dispositive issue. *Hammer v. State*, No. PD-0786-08, 2009 Tex. Crim. App. LEXIS 513, at *13-14 (Tex. Crim. App. Apr. 8, 2009).

In deciding whether a trial court abuses its discretion by concluding that the probative value of proffered evidence was not substantially outweighed by the factors listed in rule 403, an appellate court "must measure the trial court's ruling against the relevant criteria by which a Rule 403 decision is to be made." *Montgomery*, 810 S.W.2d at 392. The relevant criteria includes the inherent probative value of the evidence; the proponent's need for the evidence; the tendency of the evidence to induce a decision on an improper basis; the tendency of the evidence to confuse the jury or distract it from the main issues; the "tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence"; and whether the "presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted." *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); *see*

17

*Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). After reviewing the relevant criteria objectively, an appellate court should conclude that the trial court abused its discretion if the record reveals that one or more of the criteria demonstrates "a risk that the probative value of the tendered evidence is substantially outweighed by unfair prejudice." *Montgomery*, 810 S.W.2d at 393. In making its determination, an appellate court should consider that trial courts are given "an especially high level of deference" for determining whether to exclude evidence under 403, *Fields*, 483 F.3d at 354, and that a trial court's determination should be overturned only in rare circumstances and only when there has been "'a clear abuse of discretion,'" *United States v. Maggitt*, 784 F.2d 590, 597 (5th Cir. 1986) (quoting *United States v. Shaw*, 701 F.2d 367, 386 (5th Cir. 1983)).

Probative Value

When determining the probative value of past criminal behavior, particularly when the intent of the defendant is an issue, courts should consider the similarity of the prior offense to the current offense charged and the amount of time that has passed since the prior offense was committed. *See Kiser v. State*, 893 S.W.2d 277, 281 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd); *Morrow v. State*, 735 S.W.2d 907, 909-12 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd).

Regarding similarity, the victims from Hernandez's prior convictions were both young girls about the same age as N.C. Moreover, evidence was presented at trial showing that Hernandez was intoxicated when he committed the prior crimes and during the time in which the allegedly improper contact at issue in this case occurred. Accordingly, as mentioned previously, the district court could have reasonably concluded that the prior convictions were similar enough to properly aid the jury in its determination of whether Hernandez had an improper intent when he

18

interacted with N.C. and whether Hernandez accidentally or mistakenly caused an improper touching. *See Johnson*, 932 S.W.2d at 302 (explaining that when extraneous-offense evidence is offered to show intent rather than identity, degree of similarity need not be as high).

Regarding the passage of time, the prior criminal behavior occurred thirteen years before the trial in this case. Generally speaking, courts have found that evidence was not too remote if the amount of time that has passed is significantly less than the amount at issue here. *Compare Robinson v. State*, 701 S.W.2d 895, 898 (Tex. Crim. App. 1985) (concluding that four-to-six-month lapse in time was sufficiently small for extraneous offense to have probative value), *and Morrow*, 735 S.W.2d at 911 (deciding that seven-day difference between charged crime and extraneous offense was sufficiently close to be probative), *with Plante v. State*, 692 S.W.2d 487, 495 (Tex. Crim. App. 1985) (determining that 18-month gap was too large). But this Court has also concluded that an identical gap in time did not render the evidence of prior offenses too remote. *See Corley v. State*, 987 S.W.2d 615, 621 (Tex. App.—Austin 1999, no pet.) (concluding that crime that occurred thirteen years before trial was not too remote). That case, like this one, involved a sexual crime, and the evidence sought to be admitted was evidence that the defendant had sexually assaulted another person 13 years earlier. *Id.* at 617.

Need for the Evidence

The State's need for the evidence was high. *See Erazo*, 144 S.W.3d at 495-96 (explaining that when determining whether the proffered evidence was needed, courts should consider whether the proponent had other evidence to establish the fact of consequence, how strong the other evidence was, and whether the "fact of consequence related to an issue that is in dispute").

19

During trial, little evidence was introduced showing that Hernandez had acted "with the intent to arouse or gratify the sexual desire of any person," and the evidence that was admitted was contradicted by the testifying witnesses. For example, although Lillian and Officer Bryan both testified that N.C. had made an allegation that Hernandez had improperly placed her hands in his "private area," Officer Bryan testified that he did not actually talk with N.C. or anyone besides Lillian, and Lillian later testified that she had called the police prior to getting all of the necessary facts and now believed that Hernandez had not engaged in any inappropriate conduct. Similarly, although the videotape of N.C.'s interview at the Center contains statements by N.C. that Hernandez moved her hands to his private area, N.C. testified during the trial that she did not think that Hernandez had done anything wrong and that the touching was accidental.[8]

Improper Basis

The testimony introduced at trial demonstrated that Hernandez had, in the past, sexually abused two children. This type of evidence is inflammatory and has the potential to be unfairly prejudicial. *See Montgomery*, 810 S.W.2d at 397; *see also Martin v. State*, 176 S.W.3d 887, 897 (Tex. App.—Fort Worth 2005, no pet.) (explaining that sexually related misconduct and

---

[8] On appeal, Hernandez argues that there was no need for Nancy and J.V. to testify because prior to them testifying, the State had asked Lillian about the fact that Hernandez had been convicted of a attempted indecency with a child. Although Lillian's testimony revealed that two girls were involved in the incident, no other details regarding Hernandez's misconduct were revealed. Accordingly, Lillian's testimony did not reveal the similarity between the crime Hernandez was charged with in this case and the crimes he previously pleaded guilty to. For this reason and in light of the State's need for evidence bearing upon Hernandez's intent, we cannot conclude that the district court erred by allowing Nancy and J.V. to testify. *Cf. United States v. Fields*, 483 F.3d 313, 356 (5th Cir. 2007) (warning against using 403 to second guess admissibility determinations by concluding that other evidence could have been used rather than disputed evidence).

misconduct involving children are inherently inflammatory). However, as will be more thoroughly discussed later, the testimony regarding the prior convictions was not extensive, and the State only briefly mentioned the prior offenses in its closing and only in reference to Hernandez's intent or to combat the defensive theories of mistake or accident.

Furthermore, during his closing, Hernandez repeatedly stated that the jury could not consider the evidence of the prior offenses for the purpose of concluding that Hernandez committed the act alleged in this case because he had committed other bad acts in the past. In addition, the district court's charge to the jury also stated that the jury could only consider evidence of other bad acts only if they "find and believe beyond a reasonable doubt that the defendant participated in such . . . acts" and only "for the purpose of determining intent, preparation, plan, or to rebut accident or mistake, if any, and for no other purpose."

Undue Weight

None of the testimony regarding Herandez's prior convictions concerned complicated or technical subject matters. Accordingly, the district court could have reasonably concluded that the evidence was not the type that "might mislead" a jury that is not prepared to "judge the probative force of the evidence." *Gigliobianco*, 210 S.W.3d at 641.

Time to Present, Repetitiveness, and Potential Confusion

Although both Nancy and J.V. testified regarding Hernandez's prior convictions, neither one of them testified for very long. In fact, although the reporter's record in this case is several hundred pages long, the combined testimony of Nancy and J.V. only constitutes 30 pages of the record. Furthermore, the State only briefly mentioned the prior offenses during its closing and

only in reference to Hernandez's intent and to argue that the touching was not accidental. For this reason, there is little likelihood that the evidence could have confused or distracted the jury from the crime Hernandez was charged with in this case. *Id.*

Moreover, although Lillian had testified that Hernandez had been convicted of attempted indecency with a child before Nancy and J.V. were called to testify, no evidence had been admitted regarding the behavior that Hernandez allegedly engaged in or whether it was similar to the misconduct he was charged with in this case. Accordingly, the evidence was not repetitive of any other evidence that had already been introduced. Additionally, because J.V. admitted that her memory of the event was not that clear and because Nancy and J.V. testified regarding different aspects of the incident, their testimonies were not repetitive.

For all the reasons described above, we cannot conclude that the district court abused its discretion by allowing Nancy and J.V. to testify regarding Hernandez's prior bad acts. *See Montgomery*, 810 S.W.2d at 397 (concluding that probative value of evidence was outweighed by danger of unfair prejudice when *all* factors weighed against admission).[9]

*Pre-sentence Investigation Report*

In addition to challenging the admissibility of the testimony of Nancy and J.V., Hernandez also asserts that the district court erred in admitting the pre-sentence investigation report

---

[9] In his brief, Hernandez contends that the evidence of his prior crimes was improperly admitted as impeachment evidence. As support for this assertion, Hernandez points to rule 609(a), which concerns when evidence of a witness's prior convictions may be admitted for the purpose of attacking the witness's credibility. *See* Tex. R. Evid. 609(a). However, Hernandez did not testify during the trial and was, therefore, not a witness at the trial. *See, e.g., Theus v. State*, 845 S.W.2d 874, 879 (Tex. Crim. App. 1993) (analyzing whether trial court erred in admitting defendant's prior convictions for purpose of impeaching his testimony under rule 609).

that was prepared after Hernandez pleaded guilty to his prior offenses. The report was admitted after Nancy and J.V. finished giving their testimony. The report contains two types of information that Hernandez objects to. The first type pertains to the charges made against Hernandez. Specifically, the report contains a statement of the charges that were made against Hernandez and a brief summary of the events that occurred. The second type concerns whether Hernandez accepted responsibility for his prior offenses and was remorseful. Specifically, the report asked, "Was anyone hurt by this incident?" Hernandez's recorded response to this question was "No." During the trial, Hernandez contended that the admission of the report violated rules 404(b) and 403. Alternatively, he argued that the evidence should not have come in because he did not open the door to testimony regarding whether he regretted his prior misconduct.

Assuming without deciding that the district court erred in admitting the first type of evidence, "[t]he erroneous admission of evidence of an extraneous offense in violation of the evidentiary rules does not violate the state or federal constitutions." *See Roethel v. State*, 80 S.W.3d 276, 281 (Tex. App.—Austin 2002, no pet.). Accordingly, we must disregard the error unless it affected Hernandez's substantial rights. *See* Tex. R. App. P. 44.2(b).

Previously we determined that evidence regarding Hernandez's prior convictions was admissible under rule 403 and rule 404(b). The first type of evidence found in the report (summary of criminal action) was relatively sparse, was merely cumulative of the testimony introduced previously, did not contain any new information, and did not contain any information more inflammatory than the testimony of Nancy or J.V. Accordingly, we conclude that any error stemming from the admission of the first type of information was harmless.

23

Regarding the second type of information (remorse), the State sought to introduce that evidence in response to testimony that was elicited during Hernandez's cross-examination of Nancy. During her cross-examination, the following exchange occurred:

[Hernandez]: Okay. Mr. Hernandez pled guilty for the charges against your daughter and her friend. Right?

[Nancy]: That's what I was told, yes.

[Hernandez]: So that's taking responsibility for something he did that was wrong. Right?

[Nancy]: Yes.

[Hernandez]: The State of Texas convicted him, and he had a debt that he needed to pay to society. Right?

[Nancy]: Right.

. . .

[Hernandez]: If somebody pays a debt to society and they fulfill that debt. Right?

[Nancy]: Right.

By introducing evidence concerning his willingness to accept responsibility for his mistakes, the district court could have reasonably concluded that Hernandez opened the door to the information in the report concerning Hernandez's desire to accept responsibility for and his remorse regarding his prior misconduct. *See Hayden v. State*, No. 0860-07, 2009 Tex. Crim. App. LEXIS 510, at \*10-11 (Tex. Crim. App. April 8, 2009) (explaining that otherwise inadmissible evidence may become admissible if party opens door to evidence). In other words, the district court could have determined that Hernandez was attempting to show that he did not have the requisite intent in

24

this case because he acknowledged that his prior actions were improper and learned from his prior mistakes. For that reason, the district court could have acted within the zone of reasonable disagreement and concluded that evidence showing that he pleaded guilty but did not believe that his actions were improper bears upon his intent in this case.

Furthermore, we also cannot conclude that the district court abused its discretion by admitting the evidence over Hernandez's rule 403 objection. *See id.* at *11 (stating that even if party opens door to certain types of evidence, rule 403 may require evidence be excluded). The portion of the report at issue consisted of a single question and a one word ("No") answer, and the testimony regarding this portion of the report was minimal. In fact, the questioning regarding this portion of the report took up less than one page of the reporter's record. Also, evidence regarding Hernandez's lack of remorse for his prior actions had not been previously introduced so this evidence was not merely repetitive of other evidence. Further, the questioning did not concern a complicated subject matter. Moreover, the evidence and accompanying testimony were not overly inflammatory, particularly compared to the testimony of Nancy and J.V. In addition, the evidence related to Hernandez's intent in this crime. As mentioned previously, the State's need for evidence pertaining to intent was high in this case.

In light of the preceding and in light of the limited circumstances in which appellate courts should reverse rule 403 determinations, we cannot conclude that the district court erred by admitting the portion of the report concerning whether Hernandez believed his prior victims had been harmed by his misconduct. *See Gigliobianco*, 210 S.W.3d at 641-42 (listing factors to consider in rule 403 analysis). For all the reasons previously given, we cannot conclude that the district court erred by admitting the pre-sentence investigation report into evidence.

25

*Videotape*

In his third issue, Hernandez also argues that the trial court erred by admitting into evidence a videotape recording of N.C.'s interview at the Center.[10] The State offered the videotape as a prior recorded recollection under rule of evidence 803(5). That rule provides, in relevant part, as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (5) **Recorded Recollection.** A memorandum or record concerning a matter about which a witness once had personal knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect the knowledge correctly, unless the circumstances of preparation cast doubt on the document's trustworthiness.

Tex. R. Evid. 803(5).[11]

In order for a party to introduce a prior recorded recollection, four elements must be met. *Johnson v. State*, 967 S.W.2d 410, 416 (Tex. Crim. App. 1998). First, the witness must have "firsthand knowledge of the event." *Id.* Second, the recorded recollection must be an original

---

[10] Two videos were admitted at trial. The first was a condensed version of the interview. The second was a recording of the full interview, which was admitted in response to Hernandez's suggestion that it should be admitted under the rule of optional completeness. During the trial, Williams stated that she had compared both videos and that none of the questions or answers contained in the shortened video had been altered in any way.

[11] We note that the rule also states, "If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party." Tex. R. Evid. 803(5). In making his arguments on appeal, Hernandez does not contend that the district court should have only allowed the videotape to be played for the jury but should not have admitted it as an exhibit. Instead, Hernandez argues that rule 803 does not allow the use of this type of evidence at all.

recording that "was made at or near the time of the event while the witness had a clear and accurate memory of it." *Id.* Third, "the witness must lack a present recollection of the event." *Id.* Finally, "the witness must vouch for the accuracy of the" recording. As with the admission of evidence in general, a trial court has discretion to admit past recorded recollections, *Phea v. State*, 767 S.W.2d 263, 267 (Tex.App.—Amarillo 1989, pet. ref'd), and appellate courts will not reverse the trial court's determination absent a clear abuse of discretion, *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

Hernandez contends that it was improper to admit the videotape because N.C. unequivocally stated during her testimony that no improper touching had occurred. However, N.C. answered "I don't remember" to several of the State's questions regarding the incident. In particular, N.C. was unable to recall whether Hernandez stroked her hair, whether Hernandez told her that she needed a haircut, whether she looked up at Hernandez after he moved her hand, and whether Hernandez's mouth was open or closed when he kissed her. N.C. also testified that she did not remember if she talked to her mother about the incident again after initially telling her mother about it on the night in question.

In addition, N.C. is one of only two individuals who have had firsthand knowledge of the event. Moreover, N.C. testified that the video was made within two weeks of the night in question. Furthermore, N.C. admitted that the recording was of the interview she gave at the Center.[12] Moreover, she stated that she was telling the truth during the interview. Although N.C. later stated that her statement in the interview indicating that she had felt Hernandez's penis was

---

[12] We note that Williams also testified that the video was a true and accurate recording of the interview.

27

untrue, she also admitted that her memory of the event was better when she gave the interview than it was at the time of trial and that she remembered the event at the time of the interview.

In light of the preceding, we cannot conclude that the district court erred by determining that N.C. lacked a full recollection of the event, that N.C. endorsed the accuracy of the recording, and that the video was made near the time of the interaction with Hernandez when N.C. had an accurate memory of the event. *Johnson*, 967 S.W.2d at 416; *see also Wigiert v. State*, 948 S.W.2d 54, 58 (Tex. App.—Fort Worth 1997, no pet.) (explaining that under rules of evidence, whether item actually refreshes memory does not bear upon its admissibility; instead all that is required is that statement be shown to have been made by witness when it was fresh in his mind and to reflect knowledge at that time).

For all the reasons previously given, we overrule Hernandez's third issue on appeal.

**Second Issue**

In his second issue, Hernandez raises several arguments. First, he contends that the district court erred by admitting the evidence of his prior convictions without a limiting instruction. Second, he argues that the district court erred by allowing the State to elicit "hearsay within hearsay" testimony from Officer Bryan. Third, Hernandez asserts that the court erred by allowing the State to introduce impermissible bolstering evidence through the video of N.C.'s interview at the Center. Fourth, he argues that the district court erred by permitting the State to call witnesses for the sole purpose of impeaching them. Finally, he contends that the court erred by allowing a probation officer to testify regarding the pre-sentence investigation report even though the officer did not

28

prepare the report. Hernandez contends that this last error violated his confrontation rights under the constitution.

*Limiting Instruction*

As mentioned previously, Hernandez argues that the district court erred by failing to provide a limiting instruction regarding his prior convictions. Rule of evidence 105 explains when a party may complain on appeal about the failure to provide a limiting instruction. *See* Tex. R. Evid. 105. In particular, the rule provides, in relevant part, as follows:

> When evidence which is admissible . . . for one purpose . . . but not . . . for another purpose, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly; but, *in the absence of such request* the court's action in *admitting such evidence without limitation shall not be a ground for complaint on appeal*.

*Id.* (emphases added).

Well before the evidence regarding Hernandez's prior convictions was admitted, Hernandez did request that an instruction regarding the prior offenses be given. The request occurred outside the presence of the jury and in response to the State's assertion to the district court that it intended to offer evidence of Hernandez's prior convictions in order to rebut several of Hernandez's defensive theories. This exchange occurred the day before the evidence of Hernandez's prior convictions was introduced.

During the exchange, Hernandez asked the district court to provide a limiting instruction explaining the purposes for which the evidence may be used. The court agreed and stated

29

that it would provide a limiting instruction in accordance with rule of evidence 404(b). *See id.* R. 404(b) (providing list of permissible uses for prior misconduct). Further, the court stated that it would provide the instruction in the jury charge and would "give it at this time *if requested.*" (Emphasis added.) Later, the court stated that it would "give the limiting instruction I have indicated" when the State introduces evidence of prior offenses. While the State was seeking to refresh N.C.'s recollection by playing a portion of the interview that she gave at the Center, the court again reminded Hernandez that it would provide the limiting instruction regarding prior misconduct provided that Hernandez specifically requested that the instruction be given. Further, the district court remarked that Hernandez had not yet asked for the instruction. Specifically, the court stated as follows:

> I announced – I announced in open court out of the presence of the jury that you could have a limiting instruction. Told you what it would be. You didn't ask for it in front of the jury. I assumed that was some trial strategy on your part. If you don't ask for it, I'm not just going to jump into the middle of a case and the flow of it without someone requesting it. *You can have it at any time.* That's definitely going to be in the jury charge. (Emphasis added.)

After the court concluded, Hernandez replied, "Understood, Your Honor."

Despite receiving two reminders from the district court, Hernandez failed to request a limiting instruction at the time that the evidence of Hernandez's prior convictions was admitted through the testimony of J.V. and Nancy and through the pre-sentence investigation report. By failing to request the limiting instruction at the time the evidence was offered and by failing to object to the court's failure to give a limiting instruction, Hernandez waived this complaint for appellate purposes. *See id.* R. 105; Tex. R. App. P. 33.1(a) (explaining that to preserve complaint on appeal,

30

generally complaint must be presented to trial court and court must either rule on request or refuse to rule); *see also Williams v. State*, 273 S.W.3d 200, 230 (Tex. Crim. App. 2008) (concluding that trial court did not err by failing to provide limiting instruction when appellant failed to request instruction at time evidence was admitted); *Arnold v. State*, 234 S.W.3d 664, 673 (Tex. App.—Houston [14th Dist.] 2007, no pet) (holding that although appellant had previously requested limiting instruction, his limiting-instruction complaint was waived because he failed to request limiting instruction at time evidence was introduced).[13]

*Testimony of Officer Bryan*

In his second issue, Hernandez also asserts that the district court improperly allowed Officer Bryan to testify about what N.C. told her mother (Lillian) regarding the touching initiated by Hernandez. Specifically, Hernandez contends that because Bryan's testimony is based on statements that N.C. made to her mother and that her mother communicated to Bryan, the testimony constitutes hearsay within hearsay.

During Bryan's testimony, Hernandez made only one hearsay objection, but the district court never ruled on the objection. The relevant exchange occurred as follows:

[State]: So after Lillian Cruz put her father to bed, what did she say about her daughter, that she had talked to her daughter?

[Hernandez]: Objection, Your Honor, hearsay.

[The Court]: I'm sorry. Now, ask the question again.

---

[13] As mentioned previously, a limiting instruction was given in the jury charge.

31

[State]: After she put her father to bed, did she talk to her daughter?

[Bryan]: Yes.

[State]: What did her daughter tell her?

[Bryan]: She cried out that she had been improperly contacted by her grandfather.

[State]: Improperly contacted?

[Bryan]: Sexually.

[State]: Okay. Did [Lillian] show you where the alleged sexual contact took place?

[Bryan]: Yes.

[State]: Did you take pictures?

[Bryan]: Yes, I did.

After the trial court asked the State to repeat its question, Hernandez made no attempt to reassert his objection, ask the court for a ruling, or complain that the court had refused to rule on his objection. *See* Tex. R. App. P. 33.1(a) (explaining that to preserve issue for appeal, trial court must rule on objection "either expressly or implicitly" or must "refuse to rule on . . . objection . . . and the complaining party objected to the refusal"). Moreover, some time after this exchange, the State again asked Bryan what Lillian told him on the evening in question, and Bryan again stated that Lillian told him that N.C. told her that Hernandez had improperly touched her. Hernandez did not object to this testimony. *See Rogers v. State*, 853 S.W.2d 29, 35 (Tex. Crim. App. 1993) (stating general rule "that error regarding improperly admitted evidence is waived if that same evidence is brought in later by the defendant or by the State without objection").

In light of the preceding, we conclude that Hernandez has waived this complaint on appeal.

*Video of N.C.'s Interview*

As mentioned previously, Hernandez contends that the district court erred by allowing the State to play the recording of N.C.'s interview because the video constituted impermissible bolstering. Bolstering occurs when evidence is admitted for the sole purpose of convincing the factfinder that a "particular witness or source of evidence is worthy of credit, without substantively" making the existence of a fact of consequence more or less probable than it would have been without the evidence. *See Cohn v. State*, 849 S.W.2d 817, 819-20 (Tex. Crim. App. 1993); *see also Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009) (explaining that "bolstering" objections are inherently ambiguous because law concerning bolstering predates promulgation of rules of evidence and implicates several evidentiary rules).

Although Hernandez did not specifically identify during trial what statements in the video were improper or what the statements bolstered, in the interests of justice we will construe his argument as asserting that N.C.'s statements in the video improperly bolstered her testimony given during trial.[14] *Cf. Rivas*, 275 S.W.3d at 885 (explaining that party has the burden of explaining "'why or on what basis the otherwise admissible evidence should be excluded'" as impermissible bolstering (quoting *Cohn*, 849 S.W.2d at 21 (Campbell, J., concurring))).

---

[14] In this subissue, Hernandez also mentions the testimony of Williams (the interviewer at the Center) when asserting that impermissible bolstering evidence was admitted during trial. We note that during the trial, Williams was only called to the stand to authenticate the videotape of the interview and that this testimony occurred outside the presence of the jury.

The video contains several types of statements that relate to N.C.'s trial testimony. First, the tape contains information regarding the events leading up to the allegedly improper touching that were not disputed by Hernandez. For example, in the video, N.C. stated that when she hugged her grandfather, she put her hand on her grandfather's side and that Hernandez moved it down. In addition, N.C. also stated during the interview that her grandfather was very drunk on that evening and indicated that he was unstable on his feet. N.C. repeated these assertions during her testimony at trial. Because this information does not bear upon any of the elements of the offense charged and was not disputed by Hernandez during trial, we believe that if the district court erred by admitting this type of information, the error was harmless. *See Ivey v. State*, 250 S.W.3d 121, 126 (Tex. App.—Austin 2007) (explaining that erroneous admission of evidence is not constitutional error), *aff'd*, 277 S.W.3d 43 (Tex. Crim. App. 2009); *see* Tex. R. App. P. 44.2 (stating that nonconstitutional errors must be disregarded unless they affect party's substantial rights).

The second type of information bears upon the elements of the charged offense and is consistent with N.C.'s testimony at trial that no improper touching occurred. For example, in the video, N.C. communicated that when Hernandez moved her hand to his lap, she did not feel anything and that she did not feel anything hard or soft. These assertions were repeated by N.C. during her testimony at trial. Specifically, N.C. stated that although Hernandez moved her hand to "somewhere by his private parts" or "[o]n his private parts" or "private area," she did not feel Hernandez's "private parts." N.C. also testified that she believed that the inappropriate touching was accidental in nature. N.C.'s statements in the video that she did not feel "anything" actually benefitted Hernandez because they support Hernandez's defense that he had no improper intent when he moved N.C.'s hand. Accordingly, the admission of this type of evidence did not harm Hernandez.

34

The final type of information contained in the video are statements that bear upon the elements charged and that directly contradict N.C.'s testimony at trial. For example, in the video, when Williams asked where Hernandez moved her hand to, N.C. pointed to an area on a male drawing that she had referred to as the "private parts." Later, N.C. stated that Hernandez grabbed her hand, moved it down to the "private parts," and then patted her hand. In response to a question by Williams, N.C. said that she felt Hernandez's private parts. As mentioned previously, during the trial, N.C. denied that she felt Hernandez's private parts and also stated that Hernandez did not pat her hand. Because the information in the video contradicts N.C.'s testimony, it cannot constitute impermissible bolstering.

For all the reasons previously discussed, we cannot conclude that the district court erred by failing to conclude that the video of N.C.'s interview should not be admitted because it constituted impermissible bolstering.

*Impeachment*

In his second issue, Hernandez contends that the district court erred by allowing the State to call N.C. and Lillian to the stand for the sole purpose of admitting "otherwise inadmissible" impeachment evidence. *See White v. State*, 201 S.W.3d 233, 245 (Tex. App.—Fort Worth 2006, pet. ref'd) (explaining that "right to impeach one's own witness does not, however, permit a party to call a witness primarily for the purpose of impeaching the witness with otherwise inadmissible hearsay testimony"). Although it is not entirely clear from the briefs, Hernandez appears to be contending that the State was aware that the testimony of N.C. and Lillian would not be favorable to the State

but called them for the purpose of admitting into evidence the video of N.C.'s interview and the evidence of Hernandez's prior offenses.

As a preliminary matter, we note that we have been unable to find in the record any objection to the testimony of N.C. or Lillian that comports with this issue on appeal. *Cf. Ruth v. State*, 167 S.W.3d 560, 565 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (noting that during trial appellant objected that State was calling witness for sole purpose of impeaching her with inadmissible evidence); *see also Cook v. State*, 858 S.W.2d 467, 474 (Tex. Crim. App. 1993) (explaining that "[w]hen the complaint on appeal differs from that made at trial, the error is waived" because there is nothing to review on appeal). Accordingly, this issue was waived for appellate purposes.

Even assuming that Hernandez had preserved the issue for appeal, we would still be unable to conclude that the district court abused its discretion by allowing the State to call N.C. and Lillian to the stand. Rule of evidence 607 allows "any party, including the party calling the witness," to attack "[t]he credibility of a witness." Tex. R. Evid. 607. This rule abandoned the "voucher rule," "which prohibited a party from impeaching its own witness." *Hughes v. State*, 4 S.W.3d 1, 5 (Tex. Crim. App. 1999). Similarly, the rule does not require that the offering party be surprised by its witness's testimony before being allowed to impeach the witness. *Id.* Rather, the party's "knowledge that its own witness will testify unfavorably is a factor the trial court must consider when determining whether the evidence is admissible under Rule 403." *Id.* In other words, the party's knowledge should be considered when determining if the impeachment evidence should be

36

excluded because its probative value is substantially outweighed by its prejudicial effect. *Id.*; *see* Tex. R. Evid. 403.

Contrary to Hernandez's assertions, the evidence of his prior offenses was not offered to impeach Lillian. Instead, the evidence was offered to show that Hernandez had an improper intent when the allegedly improper touching occurred and to rebut the defensive theories of accident or mistake. Moreover, we previously determined that the district court did not abuse its discretion by admitting the evidence and by overruling Hernandez's rule 403 objection. Accordingly, we would be unable to conclude that the court erred by failing to conclude that the State called Lillian to the stand for the purpose of admitting otherwise inadmissible evidence of his prior convictions.

Similarly, we would be unable to conclude that the district court erred by allowing N.C. to testify. N.C. was called to the stand as a witness to the allegedly improper conduct by Hernandez. In fact, N.C. was the only witness to his behavior. Accordingly, her testimony and the statements she made at the Center had high probative value.

Moreover, as discussed previously, the video was offered during the testimony of N.C. after she communicated that she did not know the answer to several of the State's questions, and we determined that the district court did not abuse its discretion by concluding that the tape could be played as a prior recorded recollection, a hearsay exception. *See* Tex. R. Evid. 803(5). In other words, the evidence was not otherwise inadmissible, and we, therefore, would be unable to conclude that the district court erred by failing to conclude that the State called N.C. for the purpose of admitting otherwise inadmissible evidence. *See White*, 201 S.W.3d at 246 (concluding that district court did not abuse its discretion by admitting statements because they were admissible under

exception to hearsay and, therefore, purpose of calling witness was not solely to introduce otherwise inadmissible hearsay).

Even assuming that the video was not admissible as a prior recorded recollection, we would still be unable to conclude that district court erred. As discussed previously, both N.C.'s testimony and the video had high probative value. In addition, nothing in the record supports a determination that the State was aware before N.C. testified that she no longer had full recall of the incident in question and no longer believed that anything inappropriate had occurred. *See Ruth*, 167 S.W.3d at 566 (explaining that State must know "in advance" that witness will recant). In fact, Lillian's testimony revealed that despite repeated requests by the State before trial, she refused on several occasions to allow the State to talk with N.C. In other words, the State could not have determined what N.C.'s testimony was going to be. Further, although Lillian wrote a letter to the district attorney's office stating that she no longer felt that anything improper had occurred between Hernandez and N.C., the letter did not communicate that N.C. no longer remembered the incident, did not detail what either Lillian or N.C. would testify to if called by the State, and did not state that N.C. did not feel Hernandez's "private parts" on the night in question. Even assuming that an informal letter like the one written by Lillian could justify imputing knowledge to the State, *see Barley v. State*, 906 S.W.2d 27, 37 n.11 (Tex. Crim. App. 1995) (noting that State may be charged with knowledge that witness will recant when witness already recanted statement in "prior sworn testimony"), the assertions in that letter would not seem to be sufficient to charge the State with knowledge that N.C. would testify unfavorably towards the State. Accordingly, given the highly probative nature of the video and the lack of evidence demonstrating that the State was aware that

N.C. would not testify in its favor, we would be unable to determine that the district court erred by failing to conclude that the State called N.C. to the stand for the sole purpose of admitting otherwise inadmissible evidence.

For all these reasons, we would be unable to conclude that the district court erred by allowing the State to elicit testimony from N.C. and Lillian because the record does not support a determination that the State asked either witness to testify for the sole purpose of admitting otherwise inadmissible impeachment evidence. *Hughes*, 4 S.W.3d at 5; *see Ruth*, 167 S.W.3d at 566 (concluding that district court did not abuse its discretion by admitting statement because record supports determination that witness was not called solely for impeachment purposes).

*Probation Officer's Testimony*

As mentioned previously, the pre-sentence investigation report from Hernandez's prior convictions was admitted into evidence. The report was admitted during the testimony of a probation officer, Randy Graef. Graef was not the probation officer who prepared Hernandez's report, but he was called to the stand to provide general testimony regarding the preparation of pre-sentence investigation reports.

Graef then testified regarding the pre-sentence investigation report that was prepared when Hernandez pleaded guilty to the prior offenses. According to Graef, the report was prepared after a probation officer interviewed Hernandez about the offenses. The report contains a summary of the offenses and a statement indicating that Hernandez felt that no one was hurt as a result of his actions. Regarding that statement, the State asked Graef if, in his opinion as a probation officer, Hernadez's "statement accepts responsibility for [his prior] actions?" Graef responded, "In my opinion, the defendant did not accept responsibility for his actions in the probated offenses."

39

In light of the preceding testimony, Hernandez contends that the district court erred by allowing the report to come in because it contains the conclusions of the probation officer who prepared the report but did not testify at trial and by allowing Graef "to testify to the conclusions of the probation officer" who prepared the report. Further, Hernandez argues that admitting this evidence violated his "constitutional right to confront the witnesses against him" and that the right to confrontation mandated that he be given the option to confront the probation officer who prepared the pre-sentence investigation report regarding "the conclusions he included in" the pre-sentence investigation report.

However, Hernandez made no confrontation objection to the testimony of Graef or to the district court's decision to admit the report. Instead, Hernandez objected to the admission under rules of evidence 404(b) and 403, stated that the evidence was impermissible bolstering, and argued that Graef's testimony regarding the conclusions in the report exceeded the scope of the permissible testimony that Graef was called to provide. For this reason, we must conclude that Hernandez failed to preserve this issue for appeal. *See* Tex. R. App. P. 33.1; *see also Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2534 n.3 (2009) (explaining that "right to confrontation may . . . be waived, including by failure to object to offending evidence"); *Deener v. State*, 214 S.W.3d 522, 527 (Tex. App.—Dallas 2006, pet. ref'd) (stating that "right of confrontation is a forfeitable right . . . and must be preserved by a timely and specific objection at trial").

In light of the preceding, we overrule Hernandez's second issue on appeal.

**First Issue**

In his first issue, Hernandez argues that the district court "was biased against [him] and his lead counsel, their witnesses and their evidence, to the extent that the constitutionally

40

required fair trial was denied." *See* U.S. Const. amend. VI (governing rights of accused in criminal trials); Tex. Const. art. I, § 10 (same). In making his assertion that the district court was biased against him, Hernandez points to various rulings made by the district court, to the decision by the district court to call the Department of Family and Protective Services (the "Department") to ask for an employee to sit with N.C. during the trial, to various comments made by the district court during the trial, and to a hearing called by the district court for the purpose of determining whether Hernandez's attorney should be held in contempt.

As a preliminary matter, we note that the term "bias" does not include "all unfavorable rulings toward an individual," *Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App.—San Antonio 2007, pet. ref'd); rather, the term only refers to a "favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . . , or because it is excessive in degree," *Liteky v. United States*, 510 U.S. 540, 550 (1994). In order for the alleged bias to have denied a party due process, the party must demonstrate a "deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555; *see also Kemp v. State*, 846 S.W.2d 289, 305-06 (Tex. Crim. App. 1992) (explaining that bias must be of such degree as to deny party "due process of law"). When reviewing whether impermissible bias was present, appellate courts must bear in mind that courts enjoy a presumption of judicial impartiality. *See Abdygapparova*, 243 S.W.3d at 198.

*Prior Rulings*

In making his bias assertion, Hernandez incorporates all of the alleged errors discussed above and concludes that the district court's rulings and admission of the evidence

41

described above demonstrates the district court's hostility towards him. However, given that we have overruled all of the issues and subissues described above because we concluded that the district court did not abuse its discretion by admitting the evidence that Hernandez disputed, because Hernandez failed to preserve the alleged errors for appeal, or because the alleged errors were harmless, we cannot conclude that the district court's rulings demonstrated the type of bias that could have deprived Hernandez of his right to a fair trial.[15] *See Liteky*, 510 U.S. at 555 (noting that "judicial rulings alone almost never constitute" improper bias and only in "rarest circumstances" can

---

[15] In his brief, Hernandez asserts that the district court offered "up theories of admission for evidence that had not been previously proffered by the State" and, in effect, acted as an advocate for the State. In a footnote, Hernandez asserts that the district court informed the State that it could admit the video as a prior inconsistent statement even though the State had indicated it wanted to use the video as a prior recollection recorded. Although it is not entirely clear from his brief, we believe Hernandez is referring to an exchange between the district court and the State in which the State said it would like to play the tape to refresh N.C.'s memory. The court then asked, "And there are prior inconsistent statements on that tape," and the State answered that the tape was a "prior recollection recorded." We are not persuaded that by asking whether the video had inconsistent statements, the district court was impermissibly acting as an advocate for the State.

When making this assertion, Hernandez actually refers to a different part of the record than the portion described above. The referenced page only contains a request by Hernandez in which he asked the district court for permission to question N.C. outside the presence of the jury. Nothing in the exchange suggests that the court or any party was attempting to offer evidence under any theory.

It is possible that Hernandez intended to refer to a portion of the record near the referenced page in which the State offered the video of N.C. under rule of evidence 803(5), which governs the use of prior recorded recollections. *See* Tex. R. Evid. 803(5). The court confirmed that the State was seeking to admit the video under rule 803(5) but then later asked, "you're going to offer this under 805?" After the court mentioned rule 805, the State commented, "You stated Rule 805. It's 803(5)." The court responded, "803(5). I apologize. Yes. . . . 805 has got nothing to do with it." Assuming that this is one of the acts Hernandez believes was improper, we can find nothing in this exchange that indicates that the district court was improperly acting as an advocate for the State. Rather, the record indicates that the district court's statement was an inadvertent mistake, which was quickly corrected. Moreover, we note that rule 805 does not provide a mechanism for the admission of evidence; instead, it simply states that hearsay within hearsay will not be excluded as "hearsay" provided that "each part of the combined statements conforms with a" hearsay exception. *Id.* R. 805.

show type of favoritism necessary to show bias; disagreement with rulings is more properly raised as issue on appeal rather than as assertion of bias).

*Court Monitor*

In addition to the errors previously alleged, Hernandez argues that the district court demonstrated its bias by threatening to remove N.C. from her parents' custody during the trial. The event Hernandez is referring to occurred during a break in N.C.'s testimony in which the jury was excused. The State informed the district court that during the break, N.C.'s parents communicated that they were unhappy with the manner in which the State had questioned N.C. Further, the State relayed that N.C.'s father had said that the State's questioning was harassing and "nonsense." In light of the parents' comments, the State informed the court that it was concerned that "the rule [was] not being adhered to." For that reason, the district court asked that the Department of Family and Protective Services (the "Department") be informed about the situation so that one of its employees could sit with N.C. during the trial.

Hernandez argues that the district court's decision to call the Department and to remove N.C. from her parents' custody demonstrated the district court's hostility towards his case. As a preliminary matter, we note that the district court's actions were not directed toward Hernandez but toward N.C.'s parents. Accordingly, it is unclear how the district court's behavior could have demonstrated any bias against Hernandez.

Regardless, in light of the State's assertions that the parents were upset by statements N.C. made during her testimony, the district court could reasonably have been concerned that the rule prohibiting witnesses from discussing their testimony with one another was not being adhered to. Moreover, the district court could have reasonably concluded that it might be necessary to have an

43

employee from the Department monitor N.C.'s interaction with her parents to ensure that no improper communications were made. Importantly, although the district court originally asked for a Department employee to monitor the situation, the court changed its mind after N.C. finished her testimony shortly after the break was over.

In light of the preceding, we cannot conclude that the district court's decision to inform the Department and ask for a monitor demonstrated undue bias against Hernandez.

*Comments by the District Court*

In his first issue, Hernandez also argues that various comments made by the district court evidence its bias against him.[16] When reviewing allegations of bias, we must bear in mind that trial courts are given broad discretion to express themselves and their opinions, including opinions that may be "critical, disapproving, and even hostile toward" a party or his attorney. *Abdygapparova*, 243 S.W.3d at 199. "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display" do not establish bias on behalf of a trial court. *Liteky*, 510 U.S. at 555-56. A judge's comments regarding courtroom administration, even if the comments are stern, "remain immune." *Id.* at 556. Moreover, "a trial judge's irritation at the defense attorney does not translate to an indication as to the judge's views about the defendant's guilt or innocence." *Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001). However, a judge's comments that taint the presumption of innocence

---

[16] We note that rather than identify the specific statements that he alleges demonstrate bias in his argument section, Hernandez incorporates over 20 pages of facts into his first issue and then asserts in his argument section that the district court made improper comments. In the interests of justice, we have attempted to identify the allegedly improper statements from the fact section of Hernandez's brief.

undermine the right to a fair trial and can demonstrate fundamental error. *Blue v. State*, 41 S.W.3d 129, 132 (Tex. Crim. App. 2000).

In this issue, Hernandez refers to an exchange that occurred after the State asked to treat Lillian as a hostile witness. The exchange occurred as follows:

[The State]: Judge, I'm going to ask permission to lead. She's a hostile witness.

[The Court]: You -- there's no -- yeah, you can do that, absolutely.

[Hernandez]: Note my objection. Your Honor. I don't see anything that shows that she's a hostile witness.

[The Court]: Have you been here in the last ten minutes?

[Hernandez]: I have.

[The Court]: You're overruled.

[Hernandez]: May I approach the bench?

[The Court]: Sure.

[The Bailiff]: Cut your mike off, please.

(Bench conference on the record)

[Hernandez]: Your Honor, I'm going to object at this time to the Court's side-bar remarks. And I would ask the Court to refrain to make those kind of comments in front of the jury. If the Court has something to say that's negative about me, I'd ask that the Court bring me up or take me out and you can chastise me.

[The Court]: I'll be happy to do that.

[Hernandez]: Thank you, Judge. We'd ask the George to -- the Court to instruct --

[The Court]: That's denied.

[Hernandez]: -- well, the jury to disregard the comment that you made.

[The Court]: That's denied.

[Hernandez]: Thank you, Judge.

(End of bench conference).

Hernandez also refers to a subsequent exchange that occurred when the State asked for permission to play the video of N.C.'s interview for the jury. In response to the State's request, Hernandez raised four objections to the admission of the evidence, including an objecting referring to a previous objection that he made regarding the admission of evidence concerning Hernandez's prior convictions. Regarding the last objection, Hernandez stated that he would "prefer not to go into that in front of the jury at this time." After that statement was made, the following exchange occurred:

[The Court]: Under the rules, you don't have to, but you can do whatever you want to.

[Hernandez]: We'd ask the jury be excluded at this time.

[The Court]: No. You've already made your objection out of their presence. I've already ruled on it. You can't have them taken out of here every five minutes so you can make the same objection again, Counsel.

[Hernandez]: Well, that's not correct, Your Honor. I objected when they were outside, and you told me --

[The Court]: That's called a 104 hearing, and your objections there preserve any [error] you have, Counsel. I can't -- I'm not going to educate you on the law. I'm just telling you, you don't get to have the jury removed.

[Hernandez]: You know what, Judge, you don't need to educate me on the law. I think I know it very well. All right. You really don't. And I object to your side-bar remarks.

46

[The Court]: Well, Counsel, I've had to tell you the same thing ten times. I'm getting tired of it.

[Hernandez]: Well, we --

[The Court]: You make a ruling out of the presence of the jury on a 104 hearing. Your objections are preserved for all purposes at that hearing. You don't need to have the jury removed again so you can make another 104 objection.

Neither of the allegedly improper exchanges above were directed at Hernandez or bore upon his presumption of innocence. *See Jasper*, 61 S.W.3d at 421. Rather, the allegedly improper statements were all directly aimed at Hernandez's attorney. We note that while a "judge is necessarily allowed discretion in expressing himself while controlling trial of a case, . . . . a trial judge should avoid verbal controversies with counsel in the presence of the jury and should not express or display personal attitudes of displeasure toward counsel." *Food Source, Inc. v. Zurich Ins. Co.*, 751 S.W.2d 596, 600 (Tex. App.—Dallas 1988, writ denied); *see Pitre v. State*, No. 09-95-140-CR, 1997 Tex. App. LEXIS 3883, at *8 (Tex. App.—Beaumont July 23, 1997, no pet.) (mem. op., not designated for publication). Although the statements undoubtedly reveal the district court's frustration with Hernandez's counsel, none of the statements go beyond the bounds of expressions of dissatisfaction that imperfect people can sometimes express. *See Liteky*, 510 U.S. at 555-56. Moreover, the second exchange concerned courtroom administration, which typically cannot establish improper bias against a party. *Id.* at 556. Furthermore, although Hernandez requested a limiting instruction regarding the first exchange, he did not make the same request regarding the second exchange. Finally, we note that although the district court initially denied Hernandez's request for a limiting instruction regarding the first exchange, the court later provided the requested instruction by telling the jury the following:

47

The defense made an objection and asked to approach. And I made a comment to the effect, "have you been here the last ten minutes?"

To the extent that that may have been construed by you as a comment upon the credibility of this witness or the weight to be given her testimony, please disregard it for all purposes. It was not intended for me to indicate that I think the witness was truthful, untruthful, has great credibility, lacks great credibility, nothing of that nature. That's totally not my job. That's not my province.

So if my remarks at this time gave you some indication that I either did or did not believe this witness, it was not intended to. And it wouldn't matter. It wouldn't matter what I believe one way or the other. That witness' credibility and the weight to be given her testimony is strictly within your province and no one else's.

In light of the preceding, we cannot conclude that these exchanges, either separately or collectively, demonstrate the type of impermissible bias that could violate an individual's right to a fair trial.

*Contempt Hearing*

In his final argument on appeal, Hernandez contends that the district court showed its bias by threatening to hold him in contempt. In making this assertion, Hernandez refers to an exchange that occurred outside the presence of the jury regarding a comment the court bailiff heard Hernandez's attorney make after the court made a ruling adverse to Hernandez. Although the bailiff admitted that he did not hear who the comment was directed at, he stated that he heard Hernandez say, "full of bullshit."

Although the district court did ask for some clarification regarding the comment, we can find nothing in that exchange that revealed improper bias. When questioned about the statement, Hernandez's attorney admitted that he made a similar statement but that the statement "wasn't

directed against the Court." Instead, the attorney communicated that the statement "was more directed against the district attorney's office, and specifically to a certain district attorney who I'm accustomed to say things like that, and he says them back to me." After hearing the explanation, the district court responded, "Okay. No problem. I just wanted to be sure." The district court did not hold the attorney in contempt, and the statement was not mentioned again.

For the reasons previously given, we overrule Hernandez's first issue on appeal.

## CONCLUSION

Having overruled all of Hernandez's issues on appeal, we affirm the judgment of the district court.

---

David Puryear, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: February 5, 2010

Do Not Publish