**Thomas Clayland MORROW, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. C14–84–833–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

July 23, 1987.

Patrick Gailey and Donald W. Rogers, Jr., Houston, for appellant.

John B. Holmes, Jr., David E. Brothers and J. Sidney Crowley, Houston, for appellee.

Before JUNELL, DRAUGHN and ELLIS, JJ.

## OPINION

DRAUGHN, Justice.

Appellant Thomas Clayland Morrow was charged with the murder of Ralph Brandes but was convicted by a jury of the lesser included offense of voluntary manslaughter. The court found appellant's conviction was enhanced by two prior felony convictions and sentenced him to sixty years confinement. In his single point of error, appellant argues that the trial court erred by allowing the State to introduce evidence of an extraneous offense, which he allegedly committed one week after the primary offense. We affirm.

Although sufficiency of the evidence is not an issue, a limited rendition of the facts and evidence is necessary for clarity in this case. The facts are somewhat disputed by appellant, but essentially they reflect that appellant shot Ralph Brandes to death in a Houston lounge, the B & C Drive-In. Appellant and a companion, witness Tommy Carroll, were in the lounge drinking for some time when Brandes arrived at the lounge, ordered a beer, and went to the restroom. When he returned to finish his beer, appellant Morrow shot Brandes who then jumped over the bar. According to a witness, appellant came around the bar to Brandes, who was now on his knees, with his arms wrapped around Tommy Carroll's legs, pleading with appellant not to shoot him again. Appellant fired two more shots into Brandes hitting him in the chest and head. Brandes was shot a total of six times. No words were exchanged between appellant and the deceased immediately prior to the shooting, but the evidence reflects that several weeks before there had been some verbal exchanges between them described as "ribbing" about sexual matters directed at appellant by Brandes.

Appellant's version of the facts was considerably different from that of the other witnesses. Appellant essentially testified that he acted in self-defense. He stated that some weeks prior to the shooting he and Brandes had engaged in several heated arguments and, on the occasion of the offense, he thought Brandes had a gun because George Hayes, the lounge owner, had placed a cocked and loaded pistol on appellant's table and told him that the decedent had a gun in his hand. Appellant stated that he noticed that the decedent, who was still seated at the bar, had his hand by his leg. According to appellant, the decedent started to move and appellant placed his hand on the loaded pistol in front of him. Then the decedent jumped off the bar stool and appellant shot him. The decedent leaped over the bar, after which appellant left his table, ran around the end of the bar, and shot the decedent several times. Appellant testified that he shot the decedent again because the decedent was running toward him. Appellant stated he did not know how many times he shot the decedent. He alleged that George Hayes, the owner of the lounge, fired the last shot into Brandes' body. After shooting the decedent, appellant returned to his table and sat there for a minute. At trial appellant explained his actions as follows: "It was either kill or be killed ... I had no intentions of killing Ralph Brandes."

As rebuttal to appellant's theory of self-defense and lack of intent, the State introduced, over appellant's objection, evidence of an extraneous offense committed one week after the Brandes shooting but prior to appellant's arrest in this case. Witness David Watts testified that he had been shot without provocation by appellant. He testified that he, Tommy Carroll, and appellant had been drinking beer and driving around in Carroll's car. At Watts' request, Carroll stopped the car so that Watts could "use the restroom." While Watts was about to do so by the roadside, appellant shot him in the back. Though wounded, Watts ran from the scene, obtained help, and was taken by ambulance to a local hospital for surgery where he remained for three weeks. Tommy Carroll partially corrobo-

rated Watts' version of the incident by testifying that he heard the shot and saw Watts running, but did not know that Watts had been hit. He testified that he and appellant had been drinking prior to the shooting and that appellant did not know Watts prior to that occasion. Appellant offered no explanation about the shooting of Carroll at the time, nor did he testify regarding it.

The general appellate issue in this case is clear: Did the trial court abuse its discretion in allowing the State to introduce evidence of an extraneous offense to rebut appellant's theory of self-defense and lack of intent? To answer and further refine this issue, we must again enter what has been referred to as "the murky waters of extraneous offenses." *See e.g., Boutwell v. State,* 719 S.W.2d 164, 186 (Tex.Crim. App.1985) (Teague, J., concurring opinion); *Robinson v. State,* 701 S.W.2d 895, 901 (Tex.Crim.App.1985) (Clinton, J., opinion joining in judgment of the court). No clear-cut general rule has been fashioned to guide the trial and appellate courts concerning admission of extraneous offenses in all cases.

We can, however, begin with a general rule that is well-anchored in our jurisprudence. Evidence of an extraneous offense is not admissible to prove the guilt of the defendant. *Young v. State,* 159 Tex.Cr.R. 164, 261 S.W.2d 836, 837 (App.1953). The reason for this general rule is basic: A defendant is entitled to be tried for the offense with which he is specifically charged; and when the State seeks admission of an extraneous offense, it is inherently prejudicial because the defendant has no notice that he will be required to defend against a collateral matter. The defendant is not on trial for his propensity to commit crimes in general because that is not material as to whether he is guilty of the specific offense with which he is charged. *Templin v. State,* 711 S.W.2d 30, 32 (Tex. Crim.App.1986) (en banc); *Elkins v. State,* 647 S.W.2d 633 (Tex.Crim.App.1983).

■ This general rule of inadmissibility presents no real problem. Rather it is the exceptions that have created considerable

confusion. The courts have recognized several exceptions to the general prohibition against admitting extraneous offenses. For example, extraneous offenses have been admitted to (1) show the context in which the criminal act occurred, (2) circumstantially prove identity, (3) prove scienter, (4) prove malice or state of mind, (5) show the accused's motive, and (6) refute a defensive theory raised by the accused. *Albrecht v. State*, 486 S.W.2d 97, 100–01 (Tex.Cr.App.1972). This list caused much confusion because it was interpreted as being all-inclusive, and it became something of a litmus test to determine admissibility of extraneous offenses. *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App. 1983). We now know that the list is not exhaustive and that it is not the "true" test to determine whether an extraneous offense is admissible under an exception to the general rule. The "true" test of admissibility consists of two steps: First, the court must determine that the extraneous offense evidence is relevant to a material issue in the case other than the defendant's character. Second, the probative value of the evidence must outweigh its inflammatory or prejudicial effect. *Plante v. State*, 692 S.W.2d 487, 491 (Tex.Crim.App.1985); *Williams*, 662 S.W.2d at 346. As with most tests, applying it neatly to varied fact situations is difficult. We must avoid rote application of this test. Every case must be examined on its own facts, strengths, and weaknesses to determine whether the extraneous transaction is relevant to a material issue, and whether the relevancy value outweighs the prejudicial potential. *Boutwell*, 719 S.W.2d at 174. To assist us in this examination, various guidelines have evolved from past cases. We will now apply the "true" test to the facts of this case along with some of these guidelines.

▆ The first part of the test requires that the extraneous offense, in order to be admissible, must be relevant to a material issue in the case other than appellant's character. Among such material issues is the question of the appellant's intent, motive, or state of mind. Here, this became material because defendant raised the issue of self-defense when he testified he did not intend to kill Ralph Brandes, and that "it was either kill or be killed." It is clear that appellant is raising the issues of his lack of intent and self-defense. It is equally clear that an extraneous offense may be admissible to refute such defensive theories raised by the accused. *Albrecht*, 486 S.W.2d at 101.

The State's prima facie case reflected an unprovoked shooting which resulted in the victim's death. As stated, appellant raised the issue of self-defense and lack of intent. The State then, in rebuttal, introduced evidence it considered relevant to show that one week later appellant shot another man also without provocation. We find that the first prong of the true test was met, that the extraneous offense was relevant to material issues in the case: the appellant's intent to kill and his theory of self-defense. These two grounds for admission, intent (or lack thereof) to kill and refutation of appellant's self-defense theory, become somewhat mingled because self-defense gives rise to the question of motive or state of mind. *See Lolmaugh v. State*, 514 S.W.2d 758, 759 (Tex.Crim.App.1974); *Fielder v. State*, 683 S.W.2d 565, 575 (Tex.App.—Fort Worth 1985, pet. granted).

We now move to the second prong of the test, which is the more difficult to determine in extraneous offense cases. Did the probative value of the extraneous offense outweigh its prejudicial effect? No easy method has been devised to weigh these two elements. We have, however, been given some guidelines to assist in this evaluation. The guidelines are not universally applicable and seldom fit well beyond the facts of the case that gave rise to them. Nonetheless, we will apply these guidelines to the facts of this case with the realization that our application may not clarify the "murky waters" in this area beyond the facts of this case.

One important measure of probative value is the presence of similarity between the extraneous act and the charged offense. *Robinson*, 701 S.W.2d at 898; *Plante*, 692 S.W.2d at 493. Substantial, but not exact, similarity is necessary where appellant's intent to commit the offense charged is a

material issue. In this regard, the problem is the degree of similarity required to make the extraneous offense more probative on the issue of intent so as to outweigh its normally prejudicial effect. The probative value of a similar extraneous act is derived from the so-called doctrine of chances. This doctrine, extremely simplified for purposes of our analysis, says that the doing of extraneous acts that are substantially similar to the offense charged can be useful as a reasoning tool in reducing the possibility that the offense was done with innocent or excusable intent. *Plante*, 692 S.W.2d at 491–92. Similarity is critical in order to give the extraneous act probative evidential value. This being so, what degree of similarity is required for the extraneous act or offense to be admissible? There is no easy answer but apparently the standard for similarity is less stringent when the extraneous act is offered on the issue of the defendant's intent to commit the offense charged or his state of mind as opposed to an offer to prove a defendant's identity or to prove modus operandi. *Plante*, 692 S.W.2d at 492–93 (and cases cited therein).

What are the similarities between the extraneous offense admitted in this case and the offense charged? In each instance (1) a hand gun was used by appellant; (2) the person shot by appellant was a white male; (3) appellant was in the company of Thomas Carroll; (4) appellant and Thomas Carroll were drinking alcohol prior to the shootings; (5) there were no words exchanged between appellant and the victims immediately prior to the shooting; (6) neither of the victims verbally or physically threatened appellant; (7) neither of the victims displayed any weapons; and (8) appellant knew the victims a relatively short period of time. Appellant properly directs us to the dissimilarities between the two offenses. He points out (1) there was no evidence of prior animosity between appellant and the victim in the extraneous offense; (2) the location was different between the two offenses; (3) the deceased in the charged offense was shot several times while the survivor in the extraneous offense was shot only once; (4) the deceased

was pursued by appellant while the survivor was not; and (5) the location of the bullet wound was in the survivor's back and the deceased's wounds were elsewhere in his body.

After careful consideration, we find that, with the exception of the lack of prior animosity existing between appellant and the extraneous shooting victim, the dissimilarities are relatively insignificant in weighing the critical issues as to the probative rebuttal value of the extraneous offense on the question of intent and motive or state of mind. The fact that prior words had passed between appellant and the deceased appears significant, but is not, in our view, determinative of the admissibility question. The evidentiary weight of the prior words on the question of self-defense was minimal. Standing alone they constituted no legal justification for the shooting and represented no threat to the State's primary case. The State set out to prove appellant intentionally shot and killed the deceased without any provocation on the part of the deceased that night. It was the State's position that the prior words between appellant and the decedent had little to do with appellant's killing the decedent, except that the words made him angry. The State argued that he intended to shoot the decedent, carried a pistol with him, and needed no provocation other than the decedent's presence to carry out his intent.

When appellant testified that he did not intend to kill the decedent, that it was "kill or be killed," and that he was told the decedent had a gun, he raised the issue of self-defense, which encompasses motive and his intent. The prior words that passed between them were not sufficient to show intent, justification, or motive. Appellant's defense was grounded not on the prior words but on his alleged perception of the decedent's conduct immediately prior to the shooting. In essence, appellant was saying that he was justified in shooting the decedent or, in other words, his motive or intent in doing so was to protect himself from the decedent's use of force.

Faced with these new defensive issues concerning self-defense, intent or motive

that were based on the alleged conduct of the decedent, the State was entitled to refute that evidence by showing that one week later appellant intentionally shot a man under similar circumstances without any provocation whatsoever. This evidence was properly determined by the trial court to be of assistance to the jury in resolving the contested issue before it, which is another way of saying it was probative on the material issues of intent and self-defense. *See Williams*, 662 S.W.2d at 346. In fact, the instruction by the trial court so limited the jury's consideration of the extraneous offense to the question of appellant's intent. In sum, we find the similarity of the primary circumstances of the two offenses sufficient to make the extraneous offense probative of the material defensive issues raised; and the jury was quite capable of giving the prior words between appellant and the decedent whatever weight they merited in the context of this case.

In a case involving similar circumstances, the Court of Criminal Appeals held that evidence of an extraneous offense committed some five weeks after the primary offense was admissible to rebut the defendant's issue of self-defense and lack of intent. *Halliburton v. State*, 528 S.W.2d 216 (Tex. Crim.App.1975) (on motion for rehearing). In that case the defendant admitted shooting her husband, but raised the issue of self-defense and testified that she never intended to kill him. To rebut this, the State introduced evidence that some five weeks after the primary offense she shot another man without provocation. The court held that "the presence or absence of similarity is not entirely determinative of the admissibility of the extraneous offense. If the extraneous offense is relevant in tending to rebut the defensive theory, it should be admissible." *Halliburton*, 528 S.W.2d at 219. *See also Fielder v. State*, 683 S.W.2d at 565; *Gomez v. State*, 626 S.W.2d 113 (Tex.App.—Corpus Christi 1981, pet. ref'd).

The facts in the present case are much stronger and the circumstances much more similar to the primary offense than in *Halliburton*. We acknowledge that subsequent cases emphasize similarity as a stronger factor in extraneous offense cases. *See Plante*, 692 S.W.2d at 493 (and cases cited therein); *Williams*, 662 S.W.2d at 347. Nonetheless, *Halliburton* has not been overruled and we believe that it is compatible with those subsequent cases which indicate that the degree of similarity is less stringent where the material issue involves intent or motive. *Plante*, 692 S.W.2d at 493; *Robinson*, 701 S.W.2d at 898.

A second factor to measure the probative value of the extraneous offense is the closeness in time of that offense to the offense charged. *See Plante*, 692 S.W.2d at 495; *Robinson*, 701 S.W.2d at 898. In *Halliburton* the period of time was five weeks. Likewise, four to six months has been held sufficiently close to provide additional probative value. *Robinson*, 701 S.W.2d at 898. In the case before us, appellant carried out the extraneous shooting only seven days after the primary offense. Such closeness in time to the charged offense should weigh heavily in favor of assessing greater probative value to the extraneous offense.

A third guideline that may be used to measure probative value on the issue of intent or state of mind is the availability of alternate sources of proof. In other words, the probative value of the extraneous offense is evaluated by considering the evidence offered by the defendant to raise the defensive issue and by weighing the extent to which other evidence presented by the State establishes the unlawful intent. *Robinson*, 701 S.W.2d at 898. Where the defendant offers very little or no evidence on the issue, the probative value of the extraneous offense is very small. Similarly, where there is overwhelming proof of the defendant's criminal intent or state of mind, the probative value of extraneous offense is lessened. This alternative proof guideline has been referred to as "... the most troublesome ingredient of probative value." *Robinson*, 701 S.W.2d at 898. Indeed, its application can only be determined by careful evaluation of the evidence in each case. Where

there is specific, controverting evidence presented to support a defensive theory, the probative value of the extraneous offense is enhanced. Here, we find that the issues of self-defense and lack of intent on appellant's part were clearly and unequivocally raised by his testimony; and when we consider this defensive testimony in conjunction with the heretofore legally insignificant evidence of some prior words between appellant and the deceased, we find it makes the extraneous offense more probative as to these issues. Intent or motive is a subjective element unique to the individual defendant, which is difficult to objectively discern. Therefore, some leeway is granted in the introduction of such extraneous evidence that is probative and thereby of assistance to the fact finder in evaluating this element. Here the defensive issue was clearly raised and the State was entitled to present rebuttal evidence in the form of the extraneous offense that had significant similarities to the main offense and occurred extremely closely in time thereto.

Considering all of these factors—strong similarity, close proximity in time, and specific controverting evidence raising the defensive issues—we find the extraneous offense had probative value as to the self-defense issue and as to appellant's intent in committing the offense charged. We must now evaluate the prejudicial effect of the evidence.

The inherent prejudicial effect normally found in the use of extraneous offenses can be lessened in several ways. The trial court can do so by a proper instruction limiting the use of the extraneous offense to its specific purpose. *Plante*, 692 S.W.2d at 494; *Robinson*, 701 S.W.2d at 899. Here the trial court limited the consideration of the extraneous offense to the question of appellant's intent in connection with the offense charged.

The jury argument by the State can also be a factor with regard to prejudicial effect of such extraneous offenses. Here there was no attempt by the State to overemphasize or inflame the jury with regard to the evidence. The State was relatively brief in its reference to the extraneous offense and emphasized the limited purpose for which it was to be considered:

"... Now the Court's charge and the instruction says that you can consider other offenses in determining what the defendant's intent was the night he shot Ralph Brandes..

... and that goes to illustrate the state of mind of the defendant at the time he shot Ralph Brandes."

Further, the jury's verdict does not reflect any prejudicial motivation on its part as a result of the extraneous offense being introduced. In spite of the overwhelming evidence adverse to appellant, the jury found him guilty of the least offense possible in the case—voluntary manslaughter. Given the definition of this offense as correctly set out in the charge, it would appear that the jury found that there was provocation by the deceased that caused appellant to act under the influence of sudden passion, which lessened the effect of the criminal consequences for his act. It would appear that the jury, far from overreacting due to prejudice against appellant, was extremely fair and considered the evidence of the extraneous offense in a very limited manner as it was charged to do. We discern no prejudicial effect reflected in the jury's verdict.

After careful consideration of all the facts and circumstances of this case against the backdrop of an extremely difficult area of evidentiary law, we find the court did not abuse its discretion in admitting the extraneous offense. Appellant's point of error is overruled and the judgment of the trial court is affirmed.