# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00877-CR
## NO. 03-19-00879-CR

---

**Elio Hugo Garfias, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NOS. CR2015-464 & CR2015-137, THE HONORABLE DANIEL H. MILLS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Elio Hugo Garfias appeals from judgments of conviction finding him guilty of assault family violence with prior conviction, *see* Tex. Penal Code § 22.01(b)(2)(a), and repeated violations of a bond condition in a family-violence case, *see id.* §§ 12.42(a), 25.072(a), (e). The court sentenced him to two concurrent terms of 20 years' confinement with the Texas Department of Criminal Justice. On appeal, Garfias contends that the trial court abused its discretion by admitting evidence of a prior conviction that was more than ten years old at the time of trial. Finding no abuse of discretion, we will affirm.

## BACKGROUND

On April 15, 2015, a grand jury indicted Garfias with assault family violence with prior conviction. The charges arose from a June, 2014 altercation between Garfias and Helena, his long-term girlfriend and the mother of his four children. As a condition of bond, the trial court ordered Garfias not to "go near nor attempt any communication, directly or indirectly, with . . . Helena." On October 14, 2015, a grand jury indicted Garfias with repeated violations of a condition of bond in a family violence case, finding that Garfias had violated the condition by attempting to contact or approach Helena on at least thirteen occasions between the first week of July and the first week of August of that year.

Both charges were tried to jury over two days in October of 2019. The jury heard testimony from four witnesses—Helena; Jason Shane Rapp, a constable with Comal County; Christopher Koepp, a narcotics detective with the Comal County Sheriff's Office; and Garfias.

**Helena**

Helena testified that at the time of the altercation she and Garfias were in a long-term romantic relationship. She explained that they had dated for ten years before having children, with those children being ten, nine, and six years of age at the time of trial.[1] She testified that two of the three have Ehlers-Danlos Syndrome and that all three have attention-deficit disorder. She described herself as primarily a stay-at-home mom at the time of the alleged altercation but stated that she and Garfias worked together as independent construction contractors when possible.

---

[1] Helena also has one adult child. Garfias is not the father of Helena's eldest.

Helena testified that in June of 2014, she and Garfias had just moved the family from Bee Cave to Canyon Lake. She testified that the move was "frustrating" and that she and Garfias were not getting along well, but she agreed with counsel's characterization that they as a couple "were trying to make [the] relationship work for [the] kids," who were all aged five or younger at the time. Helena explained that the household was under financial strain and that income came primarily from governmental assistance, checks from her family, and odd jobs.

Helena then testified that on June 21, 2014, Garfias was driving the family in what she described as an "older" Suburban with Helena riding beside him and the children asleep in the back. The family was proceeding along FM 306 in Comal County when the Suburban ran out of gas and the couple began arguing over who was at fault. Helena went on to testify that they "argued for a little bit [before] he—he threw his hand back and he hit" her across the nose, causing her nose to bleed "for a long time" such that "it wouldn't stop." According to Helena, Garfias then exited the vehicle, walked around to the passenger side, opened her door, and the two began "physically fighting." When asked where Garfias was striking her, Helena testified that she could not remember. She conceded that she "hit" Garfias but said she was trying to "get out—out of the vehicle" to get away from Garfias. While testifying, Helena repeatedly indicated that she could not remember the details of the incident but that she was certain that the two were "fighting" and "hitting" each other, both in the vehicle and "on the grass." She said the children had been sleeping but awoke when the fighting got "really loud."

Helena testified that she saw a passing police cruiser and tried to wave it down because she "didn't know what else to do." She testified that she was likely crying when the officers arrived and recalled that they took photos of her injuries, which were ultimately determined to include a broken nose and multiple lacerations and contusions. Helena explained

3

that because of the incident, the Department of Family and Protective Services ("CPS," which she referred to as "the children's police") removed the children from the home. She indicated that the children were returned to her when she completed her services.

Helena conceded that she assisted Garfias with obtaining a bond and allowed him to move back into the household for multiple reasons, including that she loved him, that she wanted to stay together for the children, and that she needed access to their professional client contact information. She also conceded that both she and Garfias understood the condition that Garfias could not have any contact or communication with Helena but that they jointly agreed to violate that condition through cohabitation and contact by phone and messaging. Helena testified that her position changed in July of 2015 when Garfias became "very violent and talked . . . very ugly and—and he was very dangerous" and she realized that she could not "work with him anymore." When asked to describe what made Garfias seem "dangerous," Helena explained that he would "follow" her around town to find out where she was going and that he would sometimes camp out in her car to prevent her from going anywhere at all—even to work. She recalled several incidents during which Garfias would tail Helena's car and wait for a red light, then exit his own vehicle and pound on the side of Helena's vehicle. She also testified that at one point, Garfias "smashed" all the windows of her car to render it unusable. She described herself as "terrorized" by the behavior. Finally, Helena testified that Garfias had called her the day before trial to warn her not to appear at trial because she was the one the courts "wanted" and that "CPS was going to take the kids away again" if she appeared and testified at trial.

On cross-examination, Helena conceded that at least one of the children had tested positive for illegal substances at birth and that a 2008 protective services investigation had been directed at her—not at Garfias.

4

**Constable Rapp**

Rapp testified that he was on patrol around midnight on the night of the altercation. He recalled that he was traveling along FM 306 when he passed a darkened vehicle with doors ajar and an individual standing nearby on the shoulder. He testified that he illuminated both his emergency lights and his flood light and pulled up behind the vehicle. When asked to recite what he observed, he said:

> I observed a female subject that was—she kind of made herself visible from the driver's side. She was screaming hysterically and—and I noticed immediately with the hysterical screaming that she was covered with a significant amount of blood, which is obviously an unusual situation.

He testified that he recalled her screaming, "He's beating me to death!" Upon visual inspection, Rapp concluded Helena had been stricken "multiple times" due to trauma to "the eye and the eye socket," "the cheekbone and cheek area," the nose, and the chin.

Rapp next testified that he located and apprehended Garfias, who had "blood in his hairline with what appeared to be possibly some tissue matter or something of that nature" and "a laceration across the bridge of his nose." Rapp said he "did not observe any lacerations or any type of wounds to the hairline area or the top of his scalp that would create that blood" but agreed that photos taken at the scene suggest Garfias had suffered multiple facial injuries. Rapp's report indicates that Garfias conceded to Rapp that he "struck his wife in the face with a closed fist." The constable testified that, following that concession, he placed Garfias under arrest and called for back up.

Rapp then testified as to the scene inside the vehicle. He explained that there were "three small children" in the back of the vehicle. He described them as awake but "calm."

5

Rapp testified that there was "blood splatter" throughout the front of the vehicle, including in the console, in the floorboards, on the dashboard, and on the passenger door.

**Koepp**

Koepp testified that he first became involved in the case on July 31, 2014, when the district attorney's office reported that Helena had complained that Garfias was violating the conditions of his bond. Koepp explained that he visited Helena at her home, where she consented to a search of her phone via digital scan. He testified that he then "printed the entire report" of calls and text messages and went through the report with Helena. Koepp described the "pattern of communication" as primarily one of Garfias initiating the contact. He testified that around July 6, the frequency of Garfias's texting "increased dramatically" and became both "threatening" and "harassing." On the stand, Koepp read a series of profanity-laden threats into the record and said that Garfias repeatedly frightened Helena by threatening to report her to CPS or have her arrested. He indicated that, after reviewing the phone records and obtaining several police reports, he filed charges for violation of conditions of a bond order. Koepp described this as "the extent of [his] involvement in the case."

**Objection to Evidence of Prior Convictions**

Just before Garfias testified in his own defense, the counselors approached the bench outside the presence of the jury to discuss which of Garfias's prior convictions should be admitted into evidence. Garfias stipulated to a 2013 conviction for assault family violence against Helena. Other prior convictions tendered as possible evidence included a 1991 conviction for assault; convictions for theft in 1991, 1992, 1994, and 2006; a 1994 conviction for unauthorized use of a motor vehicle; a 1995 conviction for burglary; and a 2004 conviction for

6

assault against a female. The trial court agreed to admit the 2004, 2006, and 2013 convictions but deemed the other convictions "too remote" to allow for admission. Garfias objected to admission of the 2004 and 2006 offenses, arguing that admission would violate Rule 609, which allows admission of convictions older than ten years "only if its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." *See* Tex. R. Evid. 609(b).

In evaluating admissibility of the 2004 and 2006 convictions, the trial court addressed counsel for Garfias and observed:

> Well, [it] depend[s] on whether there's a tacking. If there's a felony and then there's another crime, then that—that ten-year statute doesn't apply if there's continuing criminal conduct. . . . That's the way the rule works. That's the way I recall it. The State can tell me if I'm wrong or you can tell me if I'm wrong . . . .

*Cf. Meadows v. State*, 455 S.W.3d 166, 170–71 (Tex. Crim. App. 2015) (describing common law "tacking" doctrine before holding that Rule 609 had "supplanted" that doctrine). When the counselors disagreed as to the proper interpretation of the rule, the trial court then clarified:

> [W]e have an assault that is being tried. So that tends to make [the 2004 conviction] become more probative here, especially if you're going to put on self-defense . . . . Clearly the relationship—the other assault comes in between him and her, the one out of Travis County. But the fact that he may have been—he's claiming the woman was the aggressor, I think that makes—that case in 2004 of assault of another female. I think it makes it more probative than it does prejudicial for that reason.

The trial court concluded, "[T]he two probative ones that deal with the violence against women . . . I think are more probative than anything else in this case" in light of Garfias's theory that he was acting in self-defense during the altercation.

7

**Garfias**

Garfias testified that Helena had been drinking throughout the day of the altercation—perhaps "half a bottle of vodka"—and that that "she said she had been doing some meth or something, some drugs . . . cocaine . . . one of them." He explained that she uses drugs "regularly" and that these had "altered her" on the day of the altercation. He recalled that while they were driving later that night, he had taken a "wrong turn," had realized the Suburban's tank was running low, and had warned Helena that they were running out of gas. He then testified that she "started getting angry and started hitting [him] in the back of the head" with "some hard object," very "aggressively" and "repeatedly." Garfias was not certain but thought the object was a perfume bottle or a phone. He testified that he realized his head was bleeding and that he had to hit her "two or three times" to regain control of the vehicle and navigate it safely to the shoulder.[2] Garfias testified that Helena struck him "maybe 20 times." He denied that he approached the passenger side of the vehicle to continue fighting with Helena and testified that the only physical violence occurred while they were both inside the vehicle. He conceded that he caused all the injuries to Helena that were documented through law enforcement photography. He also conceded that none of the photography reflects an injury to his head.

With respect to the allegations of violated bond conditions, Garfias testified that at all relevant times he understood the conditions of bond. While testifying, he initially denied that he sent Helena any text messages but conceded that he made one phone call on July 12, 2015. He then denied that the phone number attributed to him was in fact his but conceded that he sent certain text messages the day before trial discouraging Helena from appearing at trial and

---

[2] The record reflects that Garfias gesticulated to indicate how he had used his fist to hit Helena.

8

warning her that CPS would remove the children if she appeared.  He denied that he ever followed Helena's vehicle or damaged the windows of her vehicle.  Garfias surmised that if anyone had tailed Helena or damaged her vehicle, it likely would have been someone associated with Helena's alleged drug use.  He disputed evidence that Helena had repeatedly tested negative for alcohol and illegal substances throughout the pendency of the 2014 CPS case.

**Exhibits**

The State tendered, and the trial court admitted, exhibits that included text messages Helena received, voicemail Helena received, the bond order, the stipulation to the 2013 judgment of conviction against Garfias, a copy of a report in the 2014 child-protection case initiated after the altercation, and photographs taken at the scene of the altercation and during Garfias's booking.  Garfias tendered, and the trial court admitted, several photographs of Helena posing with firearms.  Garfias alleged that Helena sent these photographs by text message to intimidate him.

**Judgment and Sentencing**

At the conclusion of trial, the jury found Garfias guilty as to both charges.  For the sentencing hearing, the trial court admitted additional evidence of the 2013 assault and a recording of a phone call Garfias placed to Helena from the Comal County Jail immediately following trial.  In the recording, Garfias and Helena discuss bail, a possible plea bargain, and how to deal with the attorneys.  The trial court ultimately sentenced Garfias to two terms of twenty years of confinement "to run concurrently with each other."  Garfias filed motions for new trial, which were denied by operation of law, and then timely filed these appeals.

**DISCUSSION**

In a single, identical issue on appeal in both causes, Garfias complains that the trial court erroneously admitted evidence of his 2004 conviction for assault. We review a trial court's ruling on the admissibility of the evidence for an abuse of discretion. *See State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). Where the trial court does not make explicit findings of fact, as is the case here, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported by the record. *See Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018) (citing *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005)). A trial court's ruling will be upheld if it is correct under any theory of law applicable to the case. *See id.* (citing *Arguellez v. State*, 409 S.W.3d 657, 662–63 (Tex. Crim. App. 2013)); *see also Story*, 445 S.W.3d at 732.

In this case, Garfias complains of the trial court's invocation of the common law "tacking" doctrine to allow admission of evidence of the 2004 assault. "Under the tacking doctrine, a conviction that is more than ten years old can be tacked onto a more recent conviction for remoteness purposes, which then alters the legal standard governing its admission." *Meadows*, 455 S.W.3d at 170 (citing *Jones–Jackson v. State*, 443 S.W.3d 400, 403 (Tex. App.—Eastland 2014, no pet.). Pursuant to that doctrine, "if a defendant has one or more prior convictions that are more than ten years old and also has more recent convictions for felonies or misdemeanors involving moral turpitude, such intervening convictions remove the taint of remoteness from the prior conviction and make a conviction older than ten years admissible." *Id.* (citing *Jackson v. State*, 11 S.W.3d 336, 339 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd), and *Hernandez v. State*, 976 S.W.2d 753, 755 (Tex. App.—Houston [1st Dist.] 1998, pet.

10

ref'd)).  But the Court of Criminal Appeals has held "that the unambiguous plain language of [Rule of Evidence 609] supplants the common-law tacking doctrine," *see id.* at 169, and that admissibility of evidence of convictions older than ten years must be evaluated under that rule, *see id.* at 170–71.

Rule 609(b) provides that evidence of a "criminal conviction" older than ten years "is admissible only if its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." *See* Tex. R. Evid. 609(b).  In this case, the State tendered evidence that Garfias had been convicted of assault against an unnamed female in 2004.  The State intended to use that evidence to rebut Garfias's theories that Helena was the instigator in the altercation and that Garfias was acting solely in self-defense during the altercation.  Although the trial court made a passing reference to the tacking doctrine, it went on to explain that evidence of this offense was "more probative than anything else in the case" due to Garfias's defensive theories, including his theory that he was acting exclusively in self-defense.  "It is well settled that when an accused claims self-defense, the State, in order to show the accused's intent, may introduce rebuttal evidence of prior violent acts by the accused in order to show the intent of the person claiming self-defense." *Jones v. State*, 241 S.W.3d 666, 669 (Tex. App.—Texarkana 2007, no pet.) (analyzing admissibility under predecessor to Rule 609 and citing *Halliburton v. State*, 528 S.W.2d 216, 218–19 (Tex. Crim. App. 1975), *Johnson v. State*, 963 S.W.2d 140, 144 (Tex. App.—Texarkana 1998, pet. ref'd), and *Armstrong v. State*, 850 S.W.2d 230, 236 (Tex. App.—Texarkana 1993), *aff'd* 897 S.W.2d 361 (Tex. Crim. App. 1995)).  "Evidence of prior violent acts also may be admissible to refute a defensive theory." *Id*. (citing *Halliburton*, 528 S.W.2d at 218, *Albrecht v. State*, 486 S.W.2d 97, 101 (Tex. Crim. App. 1972), and *Morrow v. State*, 735 S.W.2d 907, 909 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd)); *see also*

*Grant v. State*, 247 S.W.3d 360, 367 (Tex. App.—Austin 2008, pet. ref'd) (explaining that evidence of prior acts of violence would be admissible under Rule 609(b) to refute theory of self-defense). Therefore, because the trial court applied the correct standard to conclude that, in this instance, evidence of the 2004 conviction is substantially more probative than prejudicial, the trial court did not abuse its discretion in admitting the evidence of that conviction. *See Jones*, 241 S.W.3d at 670. We overrule Garfias's sole issue on appeal.

## CONCLUSION

Having overruled Garfias's sole issue on appeal, we affirm the judgments of conviction.

_____
Edward Smith, Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   December 2, 2021

Do Not Publish