

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00070-CR
_____

RODRICK DESHON ARKEITH ELLIOTT, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 47765-B

Before Stevens, C.J., van Cleef and Morriss,* JJ.
Memorandum Opinion by Chief Justice Stevens

_____

*Josh R. Morriss, III, Chief Justice, Retired, Sitting by Assignment

## MEMORANDUM OPINION

Almost four years after the brutal murder of Sandy Smith, a Gregg County jury convicted Rodrick Deshon Arkeith Elliott of one count of murder,[1] and the trial court assessed a sentence of life imprisonment.  In this appeal, Elliott complains that the trial court reversibly erred when it (1) failed to suppress his pre-arrest interview with law enforcement, (2) failed to suppress evidence seized pursuant to a search warrant, and (3) admitted evidence of an extraneous offense.  Because Elliott (1) failed to preserve his pre-arrest interview complaint and (2) forfeited his complaint regarding the evidence seized pursuant to the search warrant and because (3) any error in the admission of evidence of the extraneous offense was harmless, we affirm the trial court's judgment.

## I.    Elliot Did Not Preserve His Pre-Arrest Interview Complaint

In his first issue, Elliot asserts that the trial court reversibly erred when it failed to suppress statements that he made during his pre-arrest interview.  On appeal, Elliott argues that the context of the interview showed that he was not competent at the time he made the statements in the interview and that his incompetency was evident to the officers conducting the interview.  As a result, he argues that his statements in the interview were not voluntary.  In support of his argument, Elliott points to (1) statements he made regarding other-worldly matters and spirits talking to him, (2) witnesses at trial that referred to such utterances, and (3) the fact that, five months after the interview, the trial court entered an order that found Elliott incompetent to stand trial based on a court-ordered psychological evaluation.

---

[1]*See* TEX. PENAL CODE ANN. § 19.02(b)(1).

"Preservation of error is a systemic requirement on appeal. If an issue has not been preserved for appeal, neither the court of appeals nor [the Texas Court of Criminal Appeals] should address the merits of that issue. Ordinarily, a court of appeals should review preservation of error on its own motion." *Douglas v. State*, 489 S.W.3d 613, 628–29 (Tex. App.—Texarkana 2016, no pet.) (alteration in original) (quoting *Ford v. State*, 305 S.W.3d 530, 532–33 (Tex. Crim. App. 2009) (citations omitted)). "A motion to suppress evidence is a specialized objection to the admissibility of evidence." *Id.* at 629 (citing *Galitz v. State*, 617 S.W.2d 949, 952 n.10 (Tex. Crim. App. 1981)). "As such, a motion to suppress is required to meet the requirements of an objection." *Id.* (citing *Carroll v. State*, 911 S.W.2d 210, 218 (Tex. App.—Austin 1995, no pet.)).

"To preserve an issue involving the admission of evidence for appellate review, the objection is required to inform the trial court why, or on what basis, the evidence should be excluded." *Id.* (citing *Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009)); *see also* TEX. R. APP. P. 33.1(a)(1)(A). "In order to preserve a complaint on appeal, 'all a party has to do . . . is to let the trial judge know what he wants [and] why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.'" *Id.* (alteration in original) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). "However, the objection must be sufficiently clear so that opposing counsel and the trial court have an opportunity to address or correct the purported deficiency." *Id.* (citing *Ford*, 305 S.W.3d at 533). As a result, "a general or imprecise objection will not preserve error for appeal unless 'the legal basis for the objection is *obvious* to the court

and to opposing counsel.'"[2]  *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim App. 2016) (quoting *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006)).  "For this reason, 'shotgun objections' citing many grounds for the objection without argument will not preserve points on appeal based on authority that is only mentioned in the trial court without argument." *Douglas*, 489 S.W.3d at 629 (citing *Johnson v. State*, 263 S.W.3d 287, 290 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd, untimely filed)).  "Likewise, a form motion to suppress asserting multiple grounds that are not subsequently asserted with argument at the suppression hearing will not preserve those grounds on appeal." *Id.* (citing *Johnson*, 263 S.W.3d at 289–90).  "Also, an issue on appeal that does not comport with the objection made at trial presents nothing for appellate review." *Id.* (citing *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999)).

In the trial court, although Elliott asserted that his statements were involuntary and coerced, he never argued that they were involuntary because he was incompetent.  Rather, in his motion to suppress the statements, he argued that his statements were involuntary because he was under arrest or substantially deprived of his freedom by the conduct of the officers and circumstances, that he was not read his *Miranda*[3] rights, and that he was deprived of his right to counsel.  Likewise, at the pretrial hearing on his motion to suppress, Elliott did not argue that his statements were involuntary because he was incompetent.  Rather, he argued:

> [W]e believe that the statement that was made by Mr. Elliott was involuntary.  It was coerced and enticed as to him saying something to the effect, "God wanted me to do something."  And he said that more than once, or alluded to that.

---

[2]The trial record must "indicate[] that the correct ground for complaint was obvious to the judge and opposing counsel," *Resendez v. State*, 306 S.W.3d 308, 315 (Tex. Crim. App. 2009), so that there are "statements or actions on the record that clearly indicate what the judge and opposing counsel understood the argument to be," *id.* at 316.

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

4

We believe that the -- that he was deprived of his rights to counsel. As the Court can see, he was not read his rights. And, typically, what happens is officers will talk to someone and basically talk to them until they admit something and then they read their rights. And I think that's a bad practice.

They were talking to him, they -- Detective Reeves did tell him that he was not under arrest, no rights were read. And he -- you can tell by my client's demeanor, he's sitting there. The point that I think is important is that at 21:50:51 and 21:51:32, he makes this statement, "I don't want to talk to you anymore." He makes that explicit. He says it twice. And he's even told by a detective, right after that, that, "You don't have to talk anymore."

And then later -- the Court hasn't seen it -- but later, the detective comes in and asks him specific questions. My client does not make guilty admissions, but he still asks those questions. And that's the import of what I'm saying, Judge. I think that -- I think if he -- my client did not know the magnitude of what the questioning was about. It was very casual. They were just talking. But, of course, there's an aim here to have him make specific admissions as to guilt. And the admissions he made about God telling them to do something, I think that -- that's very important to the case.

And we just believe, Judge, he was deprived of his right to counsel. He wasn't read his rights, and he did not knowingly waive that. And especially, Judge, after 21:50:51 and he said, "I don't want to talk to you anymore," and they kept talking to him. It's just not fair and it's not right.

. . . .

. . . . I'm contending that taking him into the back room, the officers are wearing guns. Judge, he -- he – and Detective Brinkley, I believe, had left, had given his video camera to Detective Reeves when she came in there. And I just think, Judge, it's a little bit intimidation.

. . . .

. . . . I believe all the questioning was designed simply to elicit testimony against him in this case. And I think the man should have been read his rights right off the bat. They weren't having a casual -- there was no intention, Judge, of having a casual conversation with this man in the back room.

5

The trial court held that any statements after Elliott said "I don't want to talk anymore" were inadmissible.[4]

Although Elliott made isolated references to him saying "God wanted me to do something" and alleged that he did not know the magnitude of what the questioning was about, both of those references were in the context of arguing that the conduct of the officers and the circumstances showed that he was coerced into making statements, deprived of his freedom, not read his *Miranda* rights, and deprived of the right to counsel. In addition, when he questioned the officer who had first made contact with him, Elliott never asked the officer whether he observed any unusual behavior or statements that may have been made by Elliott. Instead, he questioned him about how many officers were present at the time, whether Elliott was free to refuse to come to the station, whether he was told he might be arrested, and whether he was read his *Miranda* rights. Further, although the detective who interviewed Elliott testified at the hearing, Elliott did not question her. Finally, the record shows that neither the State nor the trial court understood Elliott to be arguing that he was incompetent at the time of his interview.

Since Elliott did not argue in the trial court that his statement was involuntary because he was incompetent at the time of his interview, and because his issue on appeal does not comport with the objections that he made at trial, he has presented nothing for our review. *See Vasquez*, 483 S.W.3d at 554; *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999). We, therefore, overrule this issue.

---

[4]Elliott made the statement approximately six minutes after the interview began.

## II.    Elliott Forfeited His Complaint Regarding the Seized Evidence

Elliott asserts that the trial court reversibly erred when it failed to sustain his motion to suppress certain evidence seized pursuant to a search warrant.  Pursuant to a search warrant, the contents of a black storage container, which had been identified as containing personal items that belonged to Elliott, were seized at the Hiway 80 Rescue Mission.  Among the contents was a pair of white denim pants that contained blood stains that were determined to contain the DNA of both Elliott and Smith.  Elliott filed a motion to suppress this evidence and argued at the pretrial hearing, as he does on appeal, that the search warrant did not specifically authorize the search of the storage container.[5]  The trial court denied the motion to suppress.

"Generally, to preserve error on appeal after a pretrial motion to suppress evidence is overruled, the defendant need not later object at trial to the same evidence."  *Harper v. State*, 443 S.W.3d 496, 498 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Thomas v. State*, 408 S.W.3d 877, 881 (Tex. Crim. App. 2013)).

> "But when a defendant affirmatively asserts during trial that he or she has no objection to the admission of the complained-of evidence, he or she forfeits any error in the admission of the evidence despite the pretrial ruling unless the 'record as a whole plainly demonstrates that the defendant did not intend, nor did the trial court construe, his "no objection" statement to constitute an abandonment of a claim of error that he had earlier preserved for appeal.'"

*Id.* (quoting *Thomas*, 408 S.W.3d at 885–86).  Further, "if from the record as a whole the appellate court simply cannot tell whether an abandonment was intended or understood, . . . it should regard the 'no objection' statement to be a waiver of the earlier-preserved error."  *Thomas*

---

[5]Among other things, the search warrant authorized the search of any "[b]ag, suitcase, container or other item that [held] the personal property belonging to Rodrick Elliott" located at the Hiway 80 Rescue Mission.

*v. State*, 408 S.W.3d 877, 885 (Tex. Crim. App. 2013). Thus, an "affirmative 'no objection' statement will, by itself, serve as an unequivocal indication that a waiver was both intended and understood." *Id.* at 885–86.

As the State has pointed out, when the denim jeans were offered into evidence, Elliott affirmatively stated, "No objection, Your Honor." Elliott also affirmatively stated, "No objection, Your Honor" each time the State offered evidence of the storage container and its contents: when it offered photographs of the storage container and its contents, when it offered the Forensic Biology Laboratory Report from the Texas Department of Public Safety (TDPS) Crime Laboratory that samples were collected from the denim jeans and retained for DNA analysis, and when it offered the DNA Laboratory Report from the TDPS Crime Laboratory that showed the DNA analysis of the swabbing from the denim jeans.

At no point did Elliott inform the trial court that his affirmative "no objection" to this evidence was subject to his pretrial objections. Neither did the trial court state that it understood Elliott's affirmative "no objection" to be subject to his pretrial objections. We have found nothing in the record that plainly demonstrates that Elliott did not intend, or that the trial court did not construe, his "no objection" to the admission of this evidence to constitute an abandonment of the pretrial objections that he had earlier preserved for appeal. *See id.* As a result, Elliott's affirmative "no objection" statements "serve as an unequivocal indication that a waiver was both intended and understood." *Id.* at 886.

Because Elliott has forfeited his complaint, we overrule this issue.

8

### III.    Any Error in the Admission of the Extraneous-Offense Evidence Was Harmless

Elliott also asserts that the trial court abused its discretion when it admitted evidence of an extraneous offense during the guilt/innocence phase of the trial. Before the testimony of Cindy Waddlington, the trial court held a hearing out of the presence of the jury to determine the admissibility of her testimony. The State represented that Waddlington would testify that the day before Smith's murder, Elliott came to her store, which was near the location of the murder, and threatened to stab her. Since the murder involved a stabbing, the State argued that it showed Elliott's state of mind, intent, motive, and lack of mistake. Elliott objected under both Rule 403 and Rule 404(b) of the Texas Rules of Evidence and pointed out that the murder happened in a residence as opposed to a business and that there was no evidence that Elliott possessed a knife on either occasion.[6]

Before Waddlington's testimony, the evidence showed that Smith had been murdered at her home on the afternoon of May 3, 2018. An autopsy showed that she had been beaten and that multiple cuts and stabs to her head, shoulder, back, hand, and forearm caused her death. Two witnesses testified that they had seen Elliott on the afternoon of the murder leaning on Smith's fence and that a bigger, white woman[7] went out and told him to move on. After Waddlington's testimony, more details of the murder came into evidence. Elliott's former girlfriend, Shada Lofton, testified that, on the night of May 3, Elliott was at her house talking about what had happened. He stated that he had been standing at some lady's fence in Longview

---

[6]Although Smith died as a result of the assailant cutting, slicing, and stabbing her, the murder weapon was not recovered. The State theorized that Elliott murdered Smith with a knife that was removed from a set of knives in her kitchen.

[7]Smith was 65 inches tall and weighed 267 pounds.

and that the lady asked him to get off her fence. When he asked if he was bothering her, she said that she would call the police, and he went after her into her home, where he hit her, kicked her, and stabbed her. According to Lofton, Elliott also said that he grabbed a knife out of the kitchen and made slicing motions.

After the trial court overruled Elliott's challenge to her testimony, Waddlington testified. She testified that, on May 2, 2018, she worked at Zippy J's convenience store. On that date, Elliott was "bumming" money from customers in the parking lot when she went out and told him to stop. Elliott then threatened her and told her that he was going to kill her. Although she acknowledged that she may have told the police that he said he was going to stab her, she did not remember his exact words. She also acknowledged that she did not see a knife and that he did not reach for a knife.

### A.     Admissibility of Extraneous-Offense Evidence

"The general rule is that the defendant is to be tried only for the offense charged, not for any other crimes or for being a criminal generally." *Segundo v. State*, 270 S.W.3d 79, 87 (Tex. Crim. App. 2008) (citing *Crank v. State*, 761 S.W.2d 328, 341 (Tex. Crim. App. 1988), *overruled on other grounds by Alford v. State*, 866 S.W.2d 619 (Tex. Crim. App. 1993)). "However, evidence of extraneous acts of misconduct may be admissible if (1) the uncharged act is relevant to a material issue in the case, and (2) the probative value of that evidence is not significantly outweighed by its prejudicial effect." *Id.* (citing *Crank*, 761 S.W.2d at 342). "Because the propensity to commit crimes is not a material fact in a criminal case, Rule 404(b) explicitly prohibits the admission of uncharged acts to prove conduct in conformity with a bad

character." *Id.* at 87–88 (citing TEX. R. EVID. 404(b)). In other words, the extraneous-offense evidence "must be relevant to a material issue in the case other than the [defendant]'s character." *Rogers v. Peeler*, 146 S.W.3d 765, 774 (Tex. App.—Texarkana 2004, no pet.) (citing *Morrow v. State*, 735 S.W.2d 907, 909 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd)).

When the admission of extraneous-offense evidence is challenged, the proponent of the evidence must persuade the court "that it tends to establish some elemental fact, such as identity or intent; that it tends to establish some evidentiary fact, such as motive, opportunity or preparation, leading inferentially to an elemental fact; or that it rebuts a defensive theory by showing, e.g., absence of mistake or accident." *Montgomery v. State*, 810 S.W.2d 372, 387–88 (Tex. Crim. App. 1990) (op. on reh'g)). A material issue, such as identity or intent, "may be placed in dispute by the defendant's opening statement or cross-examination, as well as by affirmative evidence offered by the defense." *Segundo*, 270 S.W.3d at 86.

On appeal, Elliott argues that the incident with Waddlington was not sufficiently similar to the charged offense to be admissible. Citing *Segundo*, he argues that, to be admissible, "the pattern and characteristics of the charged crime and the uncharged misconduct [must be] so distinctively similar that they constitute a 'signature.'" *Id.* at 88 (citing *Beets v. State*, 767 S.W.2d 711, 740–41 (Tex. Crim. App. 1987) (op. on reh'g)). Elliott points out that, while the two incidents have some general similarities, the differences are too significant for the appropriate admission of Waddlington's testimony. The State also relies on *Segundo* and argues that the similarities in the two incidents were sufficient to render the testimony admissible to show identity, motive, and absence of mistake.

11

In *Segundo*, the Texas Court of Criminal Appeals addressed the requirement of distinctive similarity of the charged offense and the uncharged misconduct when extraneous-offense evidence is offered to prove the identity of the offender. *See id.* at 86–88. In this case, Elliott placed both identity and intent in dispute in his opening statement when he alerted the jury to note his state of mind when he talked with the police and emphasized that the State had the burden to prove that Elliott, and no one else, committed the murder. In his cross-examination of the State's witnesses, Elliott continued to challenge identity and emphasized that he had not threatened others. In his final argument, he used the state-of-mind evidence to challenge the adequacy of the State's proof that he intentionally or knowingly murdered Smith. On appeal, neither Elliott nor the State addressed whether Waddlington's testimony was admissible to rebut Elliott's defensive theory that his state of mind rendered him incapable of intentional or knowing murder or that he was not a threatening individual.[8] Nevertheless, we need not address those theories because, even if the trial court erred in admitting the testimony, such error was harmless.

## B. Analysis of Harm

A trial court's error that violates an evidentiary rule "is non-constitutional and will be disregarded unless it affected the appellant's substantial rights." *Russell v. State*, 155 S.W.3d 176, 181 (Tex. Crim. App. 2005) (citing TEX. R. APP. P. 4.2(b)). An appellate court "will not overturn a criminal conviction for non-constitutional error if the appellate court, *after examining the record as a whole*, has fair assurance that the error did not influence the jury, or influenced

---

[8]"We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

the jury only slightly." *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011) (quoting *Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001)). "In considering the potential to harm, the focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict." *Id.* at 93–94 (citing *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)). In our determination, we review the record as a whole, "including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We "may also consider the jury instructions, the State's theory and any defensive theories, closing arguments[,] and even voir dire, if applicable," as well as "whether the State emphasized the error." *Id.* at 355–56. In addition, "the evidence of the defendant's guilt is a factor to be considered in any thorough harm analysis." *Id.* at 358.

Here, there was substantial evidence of Elliott's guilt. As previously noted, the evidence showed that Smith had been murdered at her home on the afternoon of May 3, 2018, and an autopsy showed that she had been beaten and that multiple cuts and stabs to her head, shoulder, back, hand, and forearm caused her death. Two witnesses, who had interacted with Elliott the day before the murder, testified that they had seen Elliott leaning on Smith's fence on the afternoon of the murder and that a bigger, white woman went out and told him to move on. The evidence also showed that, on the night of the murder, Elliott went to his former girlfriend's house and talked about what happened. He stated that he had been standing at the fence of some

13

lady in Longview who asked him to get off her fence. When he asked if he was bothering her, she said that she would call the police, and he went after her into her home, where he hit her, kicked her, and stabbed her. Elliott also said that he grabbed a knife out of the kitchen and made slicing motions. Lofton also testified that Elliott showed her a photograph on his cell phone that he claimed was the woman he killed. She described the woman as laying in blood and wearing a blue dress, the same color dress that Smith was wearing when she was murdered.

In addition, a pair of white denim jeans were recovered from the bin used by Elliott at the mission. Those jeans contained blood stains that were determined to contain the DNA of both Elliott and Smith.[9] Further, Gary Rider, who was a resident at the mission in May 2018, testified that, on the evening of May 2, 2018, he retrieved his cell phone from where it was being charged. As he retrieved it, he heard someone on bunk number three[10] speak on his phone and say, "If you found out I killed somebody, would you still love me as much?" The jury also heard the recording of a telephone call between Elliott and Curt Krohn that took place after Elliott was arrested. On that recording, Elliott can be heard telling Krohn that God told him to murder someone and that he did it. He went on to give details of the murder and repeat several times that God had told him to do it and that he did it.

Waddlington's testimony was a very small part of the trial. The State spent very little time questioning her about the incident. In its charge, the trial court included an instruction that

---

[9]Clare Moyers, the DNA section supervisor at the TDPS Crime Laboratory, testified that a swabbing from the blood stains on the jeans contained a mixture of DNA from three individuals that was 16.6 undecillion times more likely to have come from Elliott, Smith, and one unknown individual than from three unknown individuals. She explained that one undecillion is a one with thirty-six zeroes behind it.

[10]Elliott had been assigned bunk number three at the mission.

14

limited the jury's use of extraneous-offense evidence to incidents the jury found happened beyond a reasonable doubt. The State only mentioned the testimony when discussing this instruction in its closing. Elliott also mentioned Waddlington's testimony in his closing and noted that, after time had passed, she really did not remember much.

Based on this record, we have more than a fair assurance that any error in the admission of Waddlington's testimony did not influence the jury or had just a slight effect. *See id.* at 359. As a result, we find that the error, if any, was harmless. We, therefore, overrule this issue.

## IV.    Conclusion

For the reasons stated, we affirm the trial court's judgment.


                                        Scott E. Stevens
                                        Chief Justice


Date Submitted:    December 27, 2022
Date Decided:      January 9, 2023

Do Not Publish